Victoria SOVA, and Gary Sova, as Personal Representative of the Estate of Thomas Sova, Plaintiffs,

v.

The CITY OF MT. PLEASANT, a Municipal Corporation; Mt. Pleasant Department of Public Safety, Police Division; Director of Public Safety/Police Chief Martin Trombley, individually and in his Official Capacity; Sergeant Douglas LaLone, Officer Jeffrey Shell, and Officer Daniel Gaffka, individually and in their official capacities, jointly and severally, Defendants.

No. 95–CV–10385–BC.

United States District Court, E.D. Michigan, Northern Division.

Nov. 21, 1996.

**1118**

Richard A. Dietz, Detroit, MI, for Plaintiffs.

Patrick A. Aseltyne, Lansing, MI, for Defendants.

### OPINION AND ORDER GRANTING DEFENDANTS' MOTION TO DISMISS OR FOR SUMMARY JUDGMENT

CLELAND, District Judge.

#### I. Introduction

This matter is before the court on defendants' Motion to Dismiss and/or for Summary Judgment, filed September 4, 1996. Plaintiff has responded. The court held oral argument on October 30, 1996, and the motion is ripe for determination.

Plaintiffs in this matter are Victoria Sova and Gary Sova, parents of Thomas Sova, who died after being shot by one of the defendant police officers. Defendants are the City of Mt. Pleasant, the Mt. Pleasant Department of Public Safety, Police Department, Police Chief Martin Trombley, Sergeant Douglas LaLone, Officer Jeffrey Shell, and Officer Daniel Gaffka. Each of the individual defendants is sued in both their individual and official capacities. The defendants will be referred to collectively as "defendants".

At approximately 9:00 p.m. on April 21, 1994, plaintiffs received a telephone call from the mother of their son's former girlfriend which caused plaintiffs to be concerned for their son's safety.[1] Plaintiffs separately attempted to find their son in town. Gary Sova returned home at approximately 9:20 p.m. He approached the kitchen door located within a screened-in porch ("breezeway") and saw blood all over the kitchen. The kitchen door was locked. Gary Sova then ran to his neighbor Richard Bellinger's house and asked him to call 911. Gary Sova told Bellinger that he thought "Tommy's done something to himself." (Def.Br., Exh. 2, G. Sova Dep. at 31.) Bellinger called 911 at 9:27 p.m. Central Dispatch dispatched both an ambulance and a police unit to plaintiffs' home on Fancher Street in Mt. Pleasant.

Gary Sova returned to his house after asking Bellinger to call 911 and attempted to enter the kitchen again. He saw his son enter the kitchen wearing jeans. Tom Sova was bare chested and had blood covering his arms and chest from slash marks. Tom Sova had a butcher knife in each hand and told his father to leave or he would kill himself. (Def.Br., Exh. 2, G. Sova Dep. at 31.) Gary Sova walked from the breezeway, and his son followed with knives raised above his head, saying something to the effect that "I bet you won't call me your little girl again." (Def.Br., Exh. 2, G. Sova Dep. at 32.)

At that point Bellinger approached Gary Sova. Tom Sova yelled at Bellinger and walked out of the house. Both Gary Sova and Bellinger walked toward Chippewa Street. Gary Sova and Bellinger claim that they were not threatened by Tom Sova. (Pl. Br., Exh. 2, G. Sova Dep. at 41–42; Exh. 3, Bellinger Dep. at 20.) Tom Sova went back into the house. (Def.Br., Exh. 2, G. Sova Dep. at 32; Exh. 4, Bellinger Dep. at 15.)

After Tom Sova reentered the house, Jeff Prout, a volunteer firefighter, arrived. The time was approximately 9:31 p.m. Prout contacted 911 Central Dispatch; Central Dispatch sent out a call for all city units to report to the scene.

At 9:32 p.m., an ambulance arrived. During the next two minutes, officers Jeffrey Shell and Daniel Gaffka of the Mt. Pleasant Police Department ("MPPD") arrived sepa-

---

1. Tom Sova had seen his former girlfriend at an Earth Day event at Central Michigan University that day. He asked if they could resume their relationship; Sonya Honeycutt declined because she thought that Tom Sova needed to deal with his depressive episodes. (Pl.Br. at 2.)

rately. When they arrived, Tom Sova was on the second floor of the house, breaking out the glass of a window with the knives. He stood on the window ledge straddling the sash, yelling at the people in the yard that he was going to kill himself, that he had a gun, and that he was going to shoot people. (Def.Br., Exh. 5, Prosecutor's Report; Exh. 6, Shell Dep. at 173; Exh. 8, Gaffka Dep. at 21–22.) Vickie Sova testified that she did not hear Tom Sova say that he had a gun or that he would use one. (Pl.Br., Exh. 7, V. Sova Dep. at 81.) Other bystanders also heard Tom Sova threaten to get a gun. (Def.Br., Exh. 9, Abrogast Dep at 13–14; Exh. 12, Stokes Dep. at 27, 28, 69; Exh. 14, Shively Dep. at 33.) Abrogast hid behind a telephone pole for protection. (Def.Br., Exh. 9, Abrogast Dep at 13–14.) Witnesses Stevens and Funnell testified that they never heard mention of a gun, but they also testified that they did not hear everything that had been said that evening. (Def.Br., Exh. 27, Funnell Dep. at 15–18; Exh. 28, Stevens Dep. at 11–12, 15–16.)

Defendants allege that defendant Shell asked Gary Sova if there were guns in the house and that Mr. Sova told him there were. (Def.Br., Exh. 6, Shell Dep. at 176). Plaintiffs dispute this. Gary Sova did not recall whether any officer asked him if there were guns in the house. (Pl.Br., Exh. 2, G. Sova Br. at 87.) Paramedic Myers testified that Gary Sova did tell defendant Shell that there were guns in the house. (Def.Br., Exh. 11, at 24, 26.)

Vickie Sova returned to the house while Tom Sova was in the window. Tom Sova began yelling that he was going to kill her. Tom Sova was also calling her a "bitch". (Def.Br., Exh. 6, Shell Dep. at 176.) Vickie Sova asked everyone to leave him alone and that he would be okay. (Pl.Br., Exh. 7, V. Sova Dep. at 64–65.) Vickie Sova spoke to defendant LaLone, who said that the police were in charge of the scene because Tom Sova was attempting to commit suicide and that the attempt was a crime. (Pl.Br., Exh. 7, V. Sova Dep. at 65, 93.) Neither defendants nor any of the other officers at the scene set up a perimeter around the Sova house or tried to move bystanders out of the

area. (Pl.Br., Exh. 6, Stevens Dep. at 34; Exh. 8, Ros Dep. at 15; Exh. 10, Shinaver Dep. at 17; Exh. 5, Stokes Dep. at 28; Exh. 12, Myers Dep. at 31–32; Exh. 13, LaLone Dep. at 160–61.)

At 9:36 p.m., defendant LaLone and Officer Sarah Cuthbertson arrived. Tom Sova continued to yell out the window, threatening to kill himself. (Def.Br., Exh. 13, Cuthbertson Report.) Tom Sova then disappeared from the window. Less than a minute later, Tom Sova came outside through the breezeway. Defendants claim that Tom Sova had both knives in his hands. (Def.Br., Exh. 14, Shively Dep. at 33–36.) Plaintiffs claim that he had a knife in his hand but that he never threatened anyone and he never held it above his head, rather, he was asking the police to go away. (Pl.Br., Exh. 6, Stevens Dep. at 19, 21.) He walked approximately twenty-five to thirty feet in the direction of his mother, who was standing with defendant LaLone and defendant Shell. He began to threaten her, saying something like "I'm going to kill you bitch." (Def.Br., Exh. 6, Shell Dep. at 205–07; Exh. 14, Shively Dep. at 36–40.) Vickie Sova tried to grab him, and in the process got blood on her clothes. (Pl.Br., Exh. 7, V. Sova Dep. at 69–70; Exh. 6, Stevens Dep. at 19–20.) He also threatened the officers. As Tom Sova approached, defendant LaLone told the officers to get out their "Freeze & P" (a chemical spray product designed to immobilize a person temporarily) and told Tom Sova to put down the knives. Someone moved Vickie Sova out of the way. (Def.Br., Exh. 7, LaLone Dep. at 158–59; Exh. 14, Shively Dep. at 41.)

Tom Sova went back to the breezeway; defendants LaLone, Shell and Gaffka followed. Tom Sova went into the kitchen through the door located in the breezeway. He shut the wooden kitchen door and broke out a glass window, yelling something to the effect that he wanted to "kill the fuckin' cops." (Def.Br., Exh. 7, LaLone Dep. at 188–90; Exh. 13, Cuthbertson Report.) Sova also yelled at the police that he wanted them to leave. (Pl.Br., Exh. 6, Stevens Dep. at 24.)

Defendant LaLone testified that he entered the breezeway in order to prevent Tom

Sova from entering the house to obtain guns and that he remained on the breezeway after Tom Sova entered the house in order to see if Tom Sova obtained a gun and to maintain verbal contact in order to control and calm the situation. (Def.Br., Exh. 7, LaLone Dep. at 171–72.) (See also Def.Br., Exh. 6, Shell Dep. at 163; Exh. 15, Borkovich Dep. at 71–72.) When Officer Cuthbertson approached the breezeway, Tom Sova yelled at her. Defendant LaLone told her to get a canister of Clear Out (also a chemical spray) which is used in buildings to prevent barricade situations. (Def.Br., Exh. 14, Shively Dep. at 50.) This took place at approximately 9:38 or 9:39 p.m.

Defendant LaLone continued to talk to Tom Sova to tell him that they did not intend to arrest him and that an ambulance was on its way. He also told Sova that Sova would have to drop the knives before he came out. (Def.Br., Exh. 7, LaLone Dep. at 171, 181, 183; Exh. 6, Shell Dep. at 231–33; Exh. 12, Stokes Dep. at 63; Exh. 15, Borkovich Dep. at 46.) Some of the bystanders have testified that they did not hear the police offer to seek assistance for Tom Sova. (Pl.Br., Exh. 6, Stevens Dep. at 38–39, 73; Exh. 9, Funnell Dep. at 39; Exh. 16, Abrogast Dep. at 85–86; Exh. 10 Shinaver Dep. at 27–28.) Officer Shively stood outside the breezeway with his Freeze & P. Defendant Gaffka stood on one side of the kitchen door with his Freeze & P. Defendant Shell went outside to a kitchen window to station himself there with his Freeze & P, but returned to the breezeway when he found the kitchen window did not allow him a clear line. (Def.Br., Exh. 6, Shell Dep. at 224–25.)

Officer Borkovich summoned the Michigan State Police Emergency Support Team at 9:41 p.m. The dispatch reads: "We have a deranged subject here with a knife, harming himself here, and we have a real problem here unless we get this contained." (Def.Br., Exh. 16, 911 Tr.)

Tom Sova opened the wooden door and the screen door and began to step onto the breezeway. Because he was still holding knives, defendant Gaffka sprayed Sova in the face with the Freeze & P. (Def.Br., Exh. 8, Gaffka Dep. at 51–52.) Sova returned to the kitchen, yelling something about Barry De-Lau, the Isabella County Sheriff. Defendant LaLone asked another officer to call DeLau when Tom Sova indicated that he would like to talk to DeLau. One of the paramedics on the scene called at 9:42. (Def.Br., Exh. 11, Myers Dep. at 38.) This did not alter Tom Sova's behavior. (Def.Br., Exh. 7, LaLone Dep. at 183.) When Tom Sova again began to step onto the breezeway with the knives, the officers sprayed him with the Freeze & P a second time. (Def.Br., Exh. 8, Gaffka Dep. at 55–56.) Sova again stepped back into the kitchen and closed the door behind him, yelling that the mace would not work on him. (Def.Br., Exh. 14, Shively Dep. at 60.) He continued the same behavior he had exhibited all night. (Def.Br., Exh. 7, LaLone Dep., at 188–90; Exh. 14, Shively Dep. at 60–61.)

Just prior to the shooting, Vickie Sova returned to her home after leaving in search of one of her son's friends. She returned with Paul Barnett. The two of them were restrained by a police officer from coming closer to the scene. (Pl.Br., Exh. 11, Campbell Dep. at 23–24; Exh. 2, G. Sova Dep. at 77, 80.)

Tom Sova came onto the breezeway a third time with the knives.[2] The blades were pointed towards the officers; his right hand was raised above his shoulder. (Def.Br., Exh. 7, LaLone Dep. at 191; Exh. 8, Gaffka Dep. at 118; Exh. 14, Shively Dep. at 64.) Plaintiffs contend that Tom Sova did not have his hand above his head. (See footnote 2; Pl.Br., Exh. 18, photo reconstructing shooting; Exh. 19, autopsy report.) Officer Shively sprayed him with Freeze & P again.[3]

---

**2.** Defendant LaLone described Tom Sova as entering the breezeway as if he were shot out of a cannon. (Def.Br., Exh. 7, LaLone Dep. at 191.) Plaintiffs dispute this characterization. Although plaintiffs point to the deposition of witness Abrogast to support this, the only testimony the court located in the deposition is that Tom Sova did not have his hands above his head when he entered the breezeway and that he only had an object in one of his hands. (Pl.Br., Exh. 16, Abrogast Dep. at 39.)

**3.** Some of plaintiffs' witnesses have testified that they did not see the officers spray Tom Sova with Freeze & P. (Pl.Br., Exh. 3, Bellinger Dep. at

The officers yelled at Sova to drop the knives. When Sova was approximately six to nine feet away from the officers, defendant LaLone and defendant Shell fired. Defendant LaLone's first shot struck Sova in the chest. (Def.Br., Exh. 7, LaLone Dep. at 193–94.) Defendant LaLone's second shot missed Sova. (Def.Br., Exh. 7, LaLone Dep. at 193–94.) Defendant Shell's only shot was fired at the same time as defendant LaLone's second shot; Shell's shot hit Sova in Sova's raised right forearm. (Def.Br., Exh. 6, Shell Dep. at 243–44.) Defendant Gaffka did not shoot, although he was prepared to do so. (Def.Br., Exh. 8, Gaffka Dep. at 63–65.) The shooting occurred at 9:46 p.m., less than 15 minutes after the police arrived.

After Tom Sova was shot, he turned and reentered the house. He collapsed in a hallway, still holding one knife. The officers followed, and once they determined that the area was secure, they called the paramedics in. Tom Sova was pronounced dead at the hospital at 10:04 p.m. An autopsy revealed that Tom Sova's blood alcohol level was .26 percent and that he was killed by a gunshot wound to the heart. (Def.Br., Exh. 17, Autopsy Report.)

At the time of the shooting, plaintiffs Vickie and Gary Sova were not in view of the breezeway. (Pl.Br., Exh. 2, G. Sova Dep. at 80.)

Plaintiffs' complaint sets forth the following counts: violations of the Michigan Constitution for unreasonable search and seizure, right to due process, and right to be free from cruel or unusual punishment; assault and battery against the officer defendants; wrongful death; violations of § 1983 for use of excessive and unreasonable force, unreasonable search and seizure, and deprivation of life without due process. Plaintiffs claim that the defendant City of Mt. Pleasant, defendant Mt. Pleasant Department of Public Safety, Police Division, and defendant Trombley maintained a policy of negligent hiring, failure to train or supervise in regard to proper use of deadly force and procedures for subduing emotionally disturbed citizens, failure to discipline, authorizing use of objec-

tively unreasonable weapons and ammunition.

## II. Standard

Although defendants seek either a dismissal under Rule 12(b)(6) or for summary judgment under Rule 56 of the Federal Rules of Civil Procedure, the court will consider the motion solely under Rule 56. Rule 12(b) permits the court to consider a motion to dismiss under the standards for summary judgment where the parties have submitted evidence outside the pleadings. In this case, the parties have submitted extensive evidence outside the pleadings, so consideration under the summary judgment standard is appropriate.

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment is proper when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. "Where the moving party has carried its burden of showing that the pleadings, depositions, answers to interrogatories, admissions and affidavits in the record construed favorably to the non-moving party, do not raise a genuine issue of material fact for trial, entry of summary judgment is appropriate." *Gutierrez v. Lynch,* 826 F.2d 1534, 1536 (6th Cir.1987) (citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)). Summary judgment is not appropriate when "the evidence presents a sufficient disagreement to require submission to a jury." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 251–52, 106 S.Ct. 2505, 2512, 91 L.Ed.2d 202 (1986). The existence of some factual dispute does not defeat a properly supported motion for summary judgment; the disputed factual issue must be material.

The burden placed upon the movant for summary judgment is to show that the non-moving party has failed to establish an essential element of his case upon which the non-moving party would bear the ultimate burden of proof at trial. *Celotex Corp.,* 477 U.S. at 322, 106 S.Ct. at 2552. But the moving party need not support its motion with affidavits or other similar materials "negating" the opponent's claim. *Id.* at 323, 106 S.Ct. at 2552–

32; Exh. 6, Stevens Dep. at 37; Exh. 9, Funnell

Dep. at 27–28.)

53. Once the moving party meets this burden, the burden passes to the non-moving party to establish, after an adequate opportunity for discovery, the existence of a disputed factual element necessary to his or her case with respect to which he or she bears the burden of proof. *Id.* at 323, 106 S.Ct. at 2552–53. The non-moving party must show that there is sufficient evidence for a jury to return a verdict in its favor, *Street v. J.C. Bradford & Co.*, 886 F.2d 1472 (6th Cir.1989), *i.e.*, that there is doubt as to the material facts and that the record, taken as a whole, does not lead to a judgment for the movant. *Id.* at 1476. The non-moving party must present affirmative evidence on critical issues. *Id.* at 1477.

### III. Discussion

### A. Section 1983 Claims

**1. Defendants LaLone, Shell and Gaffka**

Defendants first maintain that the defendant officers are not liable in their official capacities for any alleged § 1983 violations because they acted in a constitutionally reasonable manner. Thus, defendants claim, they are likewise entitled to qualified immunity for the claims against them in their individual capacities. Plaintiffs argue that defendants did not act in a reasonable manner because their actions brought about the situation which required deadly force.

In order to prove a claim under § 1983, plaintiffs must show that they were "deprived of a right secured by the Constitution or laws of the United States, and [ ] that [they] w[ere] subjected to or caused to be subjected to this deprivation by a person acting under color of state law" without due process of law. *Searcy v. City of Dayton*, 38 F.3d 282, 286 (6th Cir.1994).

**a) Excessive Force Claim**

**i) Official Capacity Claims**

This excessive force claim appears to be brought under the Fourth Amendment's prohibition against unreasonable seizures of persons. Therefore, the court will examine the claim under the Fourth Amendment standard. *Graham v. Connor*, 490 U.S. 386, 394, 109 S.Ct. 1865, 1870–71, 104 L.Ed.2d 443 (1989); *Tennessee v. Garner*, 471 U.S. 1, 7–

22, 105 S.Ct. 1694, 1699–1707, 85 L.Ed.2d 1 (1985). Although plaintiffs claim both that defendants used excessive force and that they unreasonably seized Tom Sova, the court considers these claims to be reiterations of one another.

The parties do not dispute that the court must determine whether the defendants used excessive force by reference to the objective reasonableness test of *Graham v. Connor.* Under this test, the court must balance the intrusion on the individual's Fourth Amendment interests against the governmental interests. The Court stated that the following factors are relevant:

> the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight.

*Graham*, 490 U.S. at 396, 109 S.Ct. at 1872. The court must examine these factors from the perspective of a reasonable officer at the scene, rather than from hindsight. *Id.* at 396, 109 S.Ct. at 1871–72. The reason for this is because

> [t]he calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation.

*Id.* at 396–97, 109 S.Ct. at 1872.

Plaintiffs argue that defendants LaLone, Shell and Gaffka did not act in a reasonable manner and that any use of deadly force was impermissible because Tom Sova was not a fleeing felon.

In *Yates v. City of Cleveland*, 941 F.2d 444 (6th Cir.1991), the Sixth Circuit reviewed the district court's grant of qualified immunity to a police officer who shot a person when the officer had been in a dark hallway without outward signs of identification, without a flashlight or billy club, and did not identify himself as an officer. In that case, a police officer responded to a call of a disturbance at an apartment. Earlier in the evening, at a

neighboring apartment, the Yates family and three friends attended a party. The three non-family members were asked to leave; they left, but returned shortly with baseball bats. Later in the evening two of the family members who had not been at the party discovered what had happened and sought out the three non-family members. One member of that group shot Rodney Yates.

The officer responding to a call of disturbance at the Yates residence did not have any clothing on which would identify himself as a police officer, did not have a flashlight or a billy club. The officer approached the residence in the darkness; some members of the Yates family perceived him to be an intruder and rushed at him. The officer shot Jerome Yates after the officer was knocked down and perceived a threat to his life. The court stated that Yates had a "right not to be shot by an officer unless he posed a threat to the officer or to others" and that the right was clearly established. *Yates,* 941 F.2d at 447. The court noted that the officer had not acted as an objectively reasonable officer because the officer could not be identified as such and because the officer was hiding in the darkness. The court concluded that because Yates had a clearly established constitutional right and because the officer had not acted reasonably, the officer was not entitled to qualified immunity.

The officer also argued that he was entitled to use deadly force because he reasonably perceived a threat to his life when Yates rushed at him in the hallway. The court disagreed, finding that the officer's objectively unreasonable actions led to the conclusion that the officer was not entitled to use deadly force.

*Rhodes v. McDannel,* 945 F.2d 117 (6th Cir.1991), *cert. denied,* 502 U.S. 1032, 112 S.Ct. 872, 116 L.Ed.2d 777 (1992), presents an issue similar to the issue in this case. In that case, plaintiff called the police for help when James West was chasing her around her home with a machete. When the police arrived, plaintiff brought them into her living room. West entered the room with the machete and advanced toward plaintiff and the officers. The officers ordered West to drop the machete, but he never did so. The offi-

cers shot and killed West when he advanced to within four to six feet of them. The plaintiff argued that the officers used excessive force and that they created the need for such force.

The Sixth Circuit stated that deadly force may be used in certain circumstances. Relevant to *Rhodes* and to this case is that deadly force "may be used '[w]here the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others.'" *Rhodes,* 945 F.2d at 120 (quoting *Tennessee v. Garner,* 471 U.S. 1, 11, 105 S.Ct. 1694, 1701, 85 L.Ed.2d 1 (1985)). The court found that the officer was justified in using deadly force because West posed a threat of serious harm and because West ignored warnings to halt. *Id.* The court also found that the officer was entitled to qualified immunity. *Id.* Therefore, officers are entitled to use deadly force where a suspect poses a threat of serious harm, except, perhaps, as in *Yates,* where the officer does not act reasonably in the moments leading to the need to use deadly force for protection.

In *Smith v. Freland,* 954 F.2d 343 (6th Cir.), *cert. denied,* 504 U.S. 915, 112 S.Ct. 1954, 118 L.Ed.2d 557 (1992), a police officer saw a man speed out of an apartment complex and run a stop sign, so the officer gave chase. After a brief chase during which the man avoided attempts of two officers to stop him, he ran into an officer's car and began to drive away. At that point, the officer shot at the fleeing car; the driver was killed. The Sixth Circuit noted the Supreme Court's decision in *Garner* allows an officer to use deadly force to prevent the escape of a suspect where the suspect poses a threat of serious physical harm to the officer or others. *Freland,* 954 F.2d at 346. The court concluded that because the driver of the car posed a risk of serious harm to members of the public, the officer did not act unreasonably. Even though a roadblock had been set up at the end of the street on which the officer and the driver were located, the Sixth Circuit determined that given the split-second nature of any decisions to be made, the fact that the driver had eluded other attempts to block his car made it reasonable

for the officer to use deadly force. *Id.* at 347. *See also Reese v. Anderson*, 926 F.2d 494, 500–01 (5th Cir.1991) (finding that officer acted reasonably in shooting and killing suspect after high speed car chase and after suspect continued to lower his hands after being directed to keep his hands up while in the car).

In balancing the factors enunciated by the *Graham* Court in light of the cases determined by the Sixth Circuit, it goes without saying that deadly force is a seizure of the most permanent and serious kind. The Supreme Court has stated that

> [t]he intrusiveness of a seizure by means of deadly force is unmatched. The suspect's fundamental interest in his own life need not be elaborated upon. The use of deadly force also frustrates the interest of the individual, and of society, in judicial determination of guilt and punishment.

*Garner*, 471 U.S. at 1, 105 S.Ct. at 1696. Therefore, Tom Sova's interest is fundamental.

However, Tom Sova's interest must be balanced against the government's interest. As the *Graham* Court stated, factors such as the severity of the crime, the immediacy of a threat to officers or others, and whether the suspect was trying to elude police are relevant to this inquiry. There is little doubt that Tom Sova was not trying to elude police. Indeed, he was approaching the police at the time of the shooting. Contrary to the statements attributed to defendant LaLone by Vickie Sova, Tom Sova was not "committing a crime" by attempting suicide. However, the police officers did appropriately remain on the scene in an attempt to control a situation involving threats to the safety of Tom Sova and those at and near the house. Section 330.1427 of the Michigan Compiled Laws Annotated provides that when a police officer observes an individual who is mentally ill or impaired and is a threat to himself or others, that officer may take that individual into protective custody. There is no genuine issue of material fact that Tom Sova had severely cut himself and was holding at least

one knife at the time of the shooting. He had broken out numerous windows in plaintiffs' house with his hands and the knives. Sova was bleeding profusely, as can be seen in Exhibit 1a to defendants' motion, where blood appears above the second-story window and where blood is seen dripping down from the window.[4] Further, defendants heard Tom Sova threaten to kill himself. (Def.Br., Exh. 5, Prosecutor's Report; Exh. 6, Shell Dep. at 173; Exh. 8, Gaffka Dep. at 21–22.) Therefore, there is no genuine issue of material fact that Tom Sova appeared to be a threat to himself.

There is no genuine issue of material fact that Tom Sova was a threat to others, including the officers, at the scene. He was yelling out the window at the people present. Tom Sova threatened to get a gun; Gary Sova told police that there were guns in the house. (Def.Br., Exh. 5, Prosecutor's Report; Exh. 6, Shell Dep. at 173, 176; Exh. 8, Gaffka Dep. at 21–22; Exh. 11, Myers Dep. at 24, 26; Exh. 9, Abrogast Dep. at 13–14; Exh. 12, Stokes Dep. at 27, 28, 69; Exh. 14, Shively Dep. at 33.) Although Gary Sova "does not recall" telling the police that there were guns in the house, such does not create a genuine issue of material fact because a failure of memory is not the same thing as a denial that something occurred. Additionally, that certain witnesses did not hear Tom Sova threaten to get a gun or did not remember this is not sufficient to create a genuine issue of material fact. In particular, witnesses Stevens and Funnell, each of whom testified that they did not hear Tom Sova threaten to get a gun, also testified that they did not hear everything that happened. (Def.Br., Exh. 27, Funnell Dep. at 15–18; Exh. 28, Stevens Dep. at 11–12, 15–16.) Given the totality of the circumstances, an objectively reasonable officer would be justified in concluding that he was confronting a serious situation which required immediate and continuing attention to protect Tom Sova from himself and to protect the others present.

Finally, the court must consider the immediacy of the threat to the police and others at

---

**4.** Plaintiffs contend that the autopsy showed the cuts on Tom Sova's body to be superficial and not deadly. This fact is immaterial, however, because defendants were never close enough to Tom Sova, and could not safely get close enough to him, to judge this.

the time of the shooting. There is no genuine issue of material fact that when Tom Sova entered the breezeway on which the defendant officers were located he had at least one knife in his hands. (Pl.Br., Exh. 16, Abrogast Dep. at 39. Def.Br., Exh. 7, LaLone Dep. at 191; Exh. 8, Gaffka Dep. at 118; Exh. 14, Shively Dep. at 64.) Tom Sova did this after being repeatedly warned that he needed to come out without any knives. Whether Tom Sova entered with his hands raised above his head or not remains in dispute, but such dispute is not material. Hands holding butcher knives need not be raised to pose an immediate threat to the defendant officers, chiefly because of Sova's proximity to the officers. The autopsy report shows that Shell's shot hit Sova in the right forearm and that the bullet traveled from the front part of the forearm to the rear of the elbow at an upward angle. (Pl.Br., Exh. 19, Autopsy Report at 1, 5. Def.Br., Exh. 17, Autopsy Report at 1, 5.) Given this evidence, it cannot be disputed that Tom Sova had his hand raised, at the time of the shot, at some angle. Therefore, there is no genuine issue of material fact that the officers reasonably could have believed that Tom Sova was not in a rational frame of mind, and indeed, was in a violent frame of mind.

Plaintiffs contend that the defendant officers were too close to Tom Sova—that they did not leave an appropriate "reactionary zone" between them and Tom Sova—and therefore that they were acting in a constitutionally unreasonable manner. The court takes as true Dr. Parsons's testimony (Pl.Br., Exh. 25) that officers should keep at least a 10 to 21 foot reactionary zone between themselves and any suspect with an edged weapon, even when the officers are armed. However, the court also notes that police officers must react to the situations presented. *See Graham*, 490 U.S. at 396–97, 109 S.Ct. at 1872 ("The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments ... about the amount of force that is necessary in a particular situation."). Tom Sova entered the house and defendant LaLone believed it essential to calm Sova and to prevent him from getting a gun or to see if Sova was attempting to obtain a gun.

From the diagrams of the house and from LaLone's testimony, it is clear and thus not disputed that the breezeway provided at least a reasonable location from which to accomplish these goals. Although the breezeway required closer-than-ideal proximity, defendant LaLone and the other officers were not required by the Constitution to seek out an ideal situation in which to carry out their duties.

Additionally, plaintiffs contend that there is no genuine issue of material fact regarding the immediacy of a threat from a gun, simply because Tom Sova threatened to get a gun. The court agrees that simply saying that one is going to get a gun is not likely to create an immediate threat such that the defendant officers would have been entitled to use deadly force. However, defendants do not argue that the immediate threat which justified their use of deadly force was from a gun. The immediate threat was from the knife possessed by Tom Sova. Therefore, any dispute on the issue of whether Tom Sova presented an immediate threat of serious physical harm when he threatened to get a gun is not material.

■ The court finds that there is no genuine issue of material fact that defendant Gaffka did not use deadly force. Because defendant Gaffka did not fire his gun and shoot Tom Sova, he cannot be liable for use of excessive force, and he is entitled to summary judgment on this claim.

■ Given all the facts and circumstances, and balancing the interests present, the court finds that there is no genuine issue of material fact that defendants acted reasonably. Although their actions may not have effectively calmed Tom Sova, and although certain of their actions may have aroused him, the defendant officers were placed in an emotionally intense, charged situation. They were given less than fifteen minutes to take control of the situation; however, the court cannot conclude, as in *Yates*, that the officers were entirely responsible for creating the situation. Although Tom Sova's death is tragic, his actions placed the officers in the position of reacting to a volatile and violent set of circumstances.

■ Although plaintiffs contend that the defendant officers acted in a constitutionally unreasonable manner by entering the breezeway, considering the defendants' goal of watching Tom Sova, preventing him from looking for and obtaining a gun, and communicating with him, the court can find no genuine issue of material fact other than that entering the breezeway was a reasonable choice among the options open to the defendants. That is not to say that the defendants chose the best option; the court cannot judge that more than two years after the fact. The court is required to determine only whether the officers chose a reasonable alternative, viewing the facts objectively from the perspective of an officer at the scene. There is no genuine issue of material fact on this issue: the option chosen was reasonable. Therefore, defendants LaLone and Shell are entitled to summary judgment on the excessive force claims against them in their official capacity.

### ii) Individual Capacity Claims

The defendant officers also maintain that they are entitled to qualified immunity on the excessive force claim against them in their individual capacity. Plaintiffs contend that defendants are not and that because they have not supported this argument with appropriate law, the court should not grant summary judgment on this claim. Although defendants have not set forth the qualified immunity standard in their brief, the court will analyze this claim because its resolution hinges on the resolution of the claims against them in their official capacities.

■ As the Supreme Court has explained the rule of qualified immunity for government officials sued in their individual capacities:

> The general rule of qualified immunity is intended to provide government officials with the ability "reasonably [to] anticipate when their conduct may give rise to liability for damages." Where that rule is applicable, officials can know that they will not be held personally liable as long as their actions are reasonable in light of current American law.

*Anderson v. Creighton,* 483 U.S. 635, 646, 107 S.Ct. 3034, 3042, 97 L.Ed.2d 523 (1987) (quoting *Davis v. Scherer,* 468 U.S. 183, 195, 104 S.Ct. 3012, 3019–20, 82 L.Ed.2d 139 (1984)). Unless a government official performing a discretionary function violates clearly established statutory or constitutional rights about which a reasonable official would have known, that official is immune from personal liability. *Harlow v. Fitzgerald,* 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982); *Gazette v. City of Pontiac,* 41 F.3d 1061 (6th Cir.1994). It is not enough that the official know of some general principle of law; a reasonable official must know that a disputed action itself is illegal. *See Anderson,* 483 U.S. at 640–41, 107 S.Ct. at 3039–40. However, "[i]f the law was clearly established, the immunity defense ordinarily should fail, since a reasonably competent public official should know the law governing his conduct." *Harlow,* 457 U.S. at 818–19, 102 S.Ct. at 2738.

■ The court finds that the defendant officers are entitled to qualified immunity for the excessive force claim against them in their individual capacity because defendants did not violate a clearly established constitutional right. As noted above, defendants did not violate Tom Sova's rights because they did not use excessive force under the circumstances. Plaintiffs may not maintain an action for deprivation of rights against defendant officers in their individual capacities without first establishing a violation of those rights. Accordingly, the defendant officers are entitled to summary judgment on the excessive force claim against them in their individual capacities.

### b) Fourteenth Amendment Due Process Violation Claim

Defendants contend that plaintiffs may not maintain a procedural due process claim because plaintiffs have not pled that the state lacked adequate remedies. Plaintiffs assert that this claim lies under the substantive due process standard rather than the procedural due process standard.

■ The Sixth Circuit has stated that plaintiffs can set forth a § 1983 claim for deprivation of life without due process if the defendant has acted with gross negligence.

The court defined "gross negligence" occurring where a defendant

intentionally does something unreasonable with disregard to a known risk or a risk so obvious that he must be assumed to have been aware of it, and of a magnitude such that it is highly probable that harm will follow.

*Nishiyama v. Dickson County, Tennessee,* 814 F.2d 277, 282 (6th Cir.1987) (holding defendant liable where an officer entrusted a felon to use a patrol car unsupervised, where officers had notice that felon may be using patrol car improperly and where felon used patrol car to pull over plaintiff's decedent before beating her to death). The court's discussion above can largely be incorporated into this analysis, because the court must determine whether there is evidence that the defendant officers acted "unreasonably". As noted above, although the officers knew that their actions entailed a high risk of injury or death to Tom Sova, the court does not find a genuine issue of material fact as to reasonableness and concludes that the defendant officers acted reasonably. Accordingly, the defendant officers are entitled to summary judgment on the due process claim against them in both their official and individual capacities.

**2. City of Mt. Pleasant, Mt. Pleasant Department of Public Safety, Police Division, and Director Trombley**

 Municipalities and local officials sued in their official capacities are considered "persons" for § 1983 purposes. *Monell v. Department of Social Servs. of the City of New York,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). However, recovery under § 1983 cannot be premised upon a theory of *respondeat superior;* one of the municipality's agents must have acted according to official policy or custom. *Monell,* 436 U.S. at 690–95, 98 S.Ct. at 2035–38. In this case, plaintiffs allege essentially that defendants City of Mt. Pleasant, Mt. Pleasant Department of Public Safety, and Director of Public Safety/Police Chief Trombley maintained an official policy that resulted in a failure to train police officers in the use of deadly force and a failure to supervise the use of such force. Plaintiffs also contend that defen-

dants Mt. Pleasant, Mt. Pleasant Department of Public Safety and Trombley failed to implement proper policies, hired negligently, and had a policy permitting use of weapons and ammunition that was unreasonable.

 The court finds that because of its decision that Tom Sova was not deprived of a constitutional right, a claim against Mt. Pleasant, Mt. Pleasant Department of Public Safety and Trombley cannot survive, regardless of any policy they may have had. The Supreme Court addressed this issue in *City of Los Angeles v. Heller,* 475 U.S. 796, 106 S.Ct. 1571, 89 L.Ed.2d 806 (1986). In that case, the respondent sued petitioners for use of excessive force during an arrest and for arrest without reasonable cause. The district court held a bifurcated trial. During the first phase of the trial, the jury concluded that the individual police officer on trial had not used excessive force and did not arrest respondent without reasonable cause. The district court then dismissed the entire action, reasoning that if there was no constitutional violation, there could be no cause of action against the city or police commission.

The court of appeals reversed the dismissal, but the Supreme Court agreed with the district court, stating:

[The verdict], it seems to us, was conclusive not only as to Officer Bushey, but also as to the city and its Police Commission. They were sued only because they were thought legally responsible for Bushey's actions; if the latter inflicted no constitutional injury on respondent, it is inconceivable that petitioners could be liable to respondent.

. . . . .

If a person has suffered no constitutional injury at the hands of the individual police officer, the fact that the departmental regulations might have authorized the use of constitutionally excessive force is quite beside the point.

*Heller,* 475 U.S. at 799, 106 S.Ct. at 1573. *See also Frost v. Hawkins County Bd. of Educ.,* 851 F.2d 822, 827 (6th Cir.) ("Since we have decided that Frost suffered no constitutional deprivation, her claims under sec-

tion 1983 cannot succeed."), *cert. denied,* 488 U.S. 981, 109 S.Ct. 529, 102 L.Ed.2d 561 (1988). Accordingly, defendants City of Mt. Pleasant, Mt. Pleasant Department of Public Safety and Trombley are entitled to summary judgment on the § 1983 claims.

### B. Assault and Battery and Wrongful Death Claims

Plaintiffs also claim that defendants LaLone, Shell and Gaffka are liable for an assault and battery of Tom Sova and that all defendants are liable for his wrongful death. Defendants contend that they are entitled to governmental immunity. Plaintiffs maintain that the officers are not entitled to immunity because they committed an intentional tort for which such immunity is improper. Plaintiffs concede that defendant Mt. Pleasant is entitled to immunity, but assert that defendant Trombley is not.

#### 1. Defendant Trombley

■ Michigan law provides that certain government officials may be immune from tort liability. The provision which applies to defendant Trombley reads as follows:

> (5) Judges, legislators, and the elective or highest appointive executive officials of all levels of government are immune from tort liability for injuries to persons or damages to property whenever they are acting within the scope of their judicial, legislative, or executive authority.

M.C.L.A. § 691.1407(5). Plaintiffs claim that the court may not grant summary judgment on the state law claims on the basis of governmental immunity because defendants had not submitted at that time any evidence that defendant Trombley is the "elective or highest appointive executive official" at his level of government. However, pursuant to a subsequent order of the court, defendants did submit evidence on this issue which establishes that defendant Trombley is indeed the highest appointed executive official within the Department of Public Safety. Since there is no genuine issue of material fact that defendant Trombley is the highest appointed executive official within his department, he is entitled to summary judgment on the state law claims by virtue of the doctrine of governmental immunity as codified at M.C.L.A. § 691.1407(5).

#### 2. Defendants LaLone, Shell and Gaffka

Defendants LaLone, Shell and Gaffka contend that they are entitled to governmental immunity under § 691.1407(2). The provision of the Michigan code which applies to the defendant officers reads:

> (2) Except as otherwise provided in this section, and without regard to the discretionary or ministerial nature of the conduct in question, each officer and employee of a governmental agency, each volunteer acting on behalf of a governmental agency, and each member of a board, council, commission, or statutorily created task force of a governmental agency shall be immune from tort liability for injuries to persons or damages to property caused by the officer, employee, or member while in the course of employment or service or volunteer while acting on behalf of a governmental agency if all the following are met:
>
> (a) The officer, employee, member, or volunteer is acting or reasonably believes he or she is acting within the scope of his or her authority.
>
> (b) The governmental agency is engaged in the exercise or discharge of a governmental function.
>
> (c) The officer's, employee's, member's, or volunteer's conduct does not amount to gross negligence that is the proximate cause of the injury or damage. As used in the subdivision, "gross negligence" means conduct so reckless as to demonstrate a substantial lack of concern for whether an injury results.

M.C.L.A. § 691.1407(2), M.S.A. § 3.996(107)(2).

Defendants need to prove certain elements in order to be immune from suit under this section. Defendants must demonstrate that (1) they were acting on behalf of a governmental agency, (2) they reasonably believed they were acting within the scope of their authority, (3) they were discharging a governmental function, and (4) their actions did not constitute gross negligence, as defined by the statute to mean a substantial lack of concern for the resulting injury. M.C.L.A.

§ 691.1407(2)(c), M.S.A. § 3.996(107)(2)(c). There is no dispute on the first three elements. Plaintiffs contend, however, that defendants LaLone, Shell and Gaffka were grossly negligent within the meaning of the statute. They point chiefly to the question of fact regarding the propriety of the defendant officers' use of deadly force to support this conclusion.

In *Roxbury v. Paul*, 838 F.Supp. 1204 (W.D.Mich.1992), *aff'd*, 7 F.3d 234 (1993) (Table), the court was presented with a question of whether police officers were entitled to governmental immunity where they employed deadly force against the decedent. In that case, the officers reported to the scene after reports of gunfire. The decedent had a gun, was ordered to drop the gun, and failed to do so. The defendants claimed that the decedent raised his arm and pointed the gun at one of the officers. The plaintiff claimed that while decedent was holding a gun, he was holding it barrel-up and he was not holding it in a threatening manner. In addressing the officers' governmental immunity argument, the court noted that "generally, immunity was not available as a defense to an intentional tort claim." *Roxbury*, 838 F.Supp. at 1209. The court went on to say that immunity was available as a defense "when actions constituting intentional torts were justified under the circumstances." *Id.* The court refused to grant summary judgment on this issue, however, because a genuine issue of material fact existed as to whether or not the defendants were protecting themselves.

 In this case, however, there is no such genuine issue of material fact. The court has already found that there is no genuine issue of material fact that Tom Sova was approaching the defendant officers in a threatening way—he was within six to nine feet of them with at least one large knife and he had been acting violently throughout his encounter with the defendant officers. Because the defendant officers were justified in their actions, the court finds that there they are entitled to governmental immunity on the state law claims.

## C. Michigan Constitutional Claims

Plaintiffs may press claims under the Michigan constitution only where they have valid § 1983 claims that would be barred by the Eleventh Amendment. In *Roxbury*, the Western District of Michigan stated:

> In *Pleasant* [*v. Zamieski*, 895 F.2d 272 (6th Cir.), *cert. denied*, 498 U.S. 851, 111 S.Ct. 144, 112 L.Ed.2d 110 (1990)], the Sixth Circuit found *Smith* [*v. Department of Public Health*, 428 Mich. 540, 410 N.W.2d 749 (1987)] to hold that a cause of action under the Michigan Constitution is limited to those cases "in which the state's liability would, but for the Eleventh Amendment, render it liable under 42 U.S.C. § 1983 standard for local governments articulated in *Monell v. New York City Dept. of Social Services.*" ... *Pleasant* makes clear that a Michigan constitutional claim exists only in situations where a plaintiff's Section 1983 claim is barred by immunity.

*Roxbury*, 838 F.Supp. at 1208 (quoting *Pleasant*, 895 F.2d at 278). Based on this reasoning, plaintiffs may have appropriately set forth causes of action under the Michigan Constitution where they have a recoverable claim and where that claim is barred by the Eleventh Amendment. In this case, plaintiffs fail on both grounds with respect to the excessive force and due process claims. The Eleventh Amendment does not apply because the defendants are not state actors. The court has already concluded that plaintiffs do not have valid excessive force or due process claims.

However, the court has not yet considered the merits of the cruel and unusual punishment claim that plaintiffs set forth with respect to the Michigan Constitution. The court will do so even though the Eleventh Amendment has not barred such a claim.

 Plaintiffs may not recover under the Eighth Amendment because the Eighth Amendment applies only where the state has secured a formal adjudication of guilt. *Revere v. Massachusetts General Hospital*, 463 U.S. 239, 244, 103 S.Ct. 2979, 2983, 77 L.Ed.2d 605 (1983); *Ingraham v. Wright*, 430 U.S. 651, 671 n. 40, 97 S.Ct. 1401, 1412 n. 40, 51 L.Ed.2d 711 (1977) ("Eighth Amend-

ment scrutiny is appropriate only after the State has complied with the constitutional guarantees traditionally associated with criminal prosecutions.... [T]he State does not acquire the power to punish with which the Eighth Amendment is concerned until after it has secured a formal adjudication of guilt in accordance with due process of law."). Michigan courts use federal decisions on the Eighth Amendment to guide their decisions on the related Michigan constitutional provision. *Johnson v. Wayne County,* 213 Mich. App. 143, 540 N.W.2d 66 (1995), *appeal denied,* —— Mich. ——, 554 N.W.2d 903 (1996) (Table). Since Tom Sova was never adjudicated guilty of any crime, the Eighth Amendment does not apply. Defendants are entitled to summary judgment on this claim.

### IV. Conclusion

Accordingly, IT IS ORDERED that, for the reasons stated herein, that defendants' Motion to Dismiss or for Summary Judgment is hereby GRANTED.