Victoria and Gary SOVA, as Personal Representatives of the Estate of Thomas Sova, deceased, Plaintiffs–Appellants,

v.

The CITY OF MT. PLEASANT; Mt. Pleasant Department of Public Safety, Police Division; Director of Public Safety/Police Chief Martin Trombley; Sergeant Douglas LaLone; Officer Jeffrey Shell; Officer Daniel Gaffka, Defendants–Appellees.

No. 96–2480.

United States Court of Appeals,
Sixth Circuit.

Argued Feb. 3, 1998.

Decided April 24, 1998.

Richard A. Dietz (argued and briefed), Foster, Meadows & Ballard, Detroit, MI, for Plaintiffs–Appellants.

Patrick A. Aseltyne (argued), Johnson & Rosati, Lansing, MI, Marcia L. Howe (briefed), Johnson, Rosati, Galica, Labarge, Aseltyne & Field, Farmington Hills, MI, for Defendants–Appellees.

Before: MERRITT, KENNEDY, and BOGGS, Circuit Judges.

## OPINION

MERRITT, Circuit Judge.

Two Mt. Pleasant police officers shot and killed Thomas Sova standing in the doorway of his parents' kitchen within fifteen minutes of arriving on the scene of his attempted suicide. Thomas's parents sued the city, the police department, the police chief, and the three officers who were immediately responsible, asserting constitutional claims under 42 U.S.C. § 1983 and supplemental claims under Michigan tort law and the Michigan Constitution. After extensive discovery, the District Court entered summary judgment in favor of all the defendants after ruling that the officers acted reasonably as a matter of law when they shot and killed Thomas. The court stated that the threat Thomas posed to himself justified, in part, the use of deadly force against him. The central issue in this appeal is whether the District Court should have given qualified immunity to the officers who shot Thomas when it was clear that the parties have irreconcilable versions of what happened the night Thomas was killed.

Because the District Court improperly disregarded the factual disputes underlying the Sovas' claims against the two officers who shot Thomas, we reverse summary judgment in their favor and remand for trial on the Sovas' federal constitutional and state tort claims. Otherwise, we affirm the District Court.

## I.

Thomas Sova suffered from depression. His depression caused his long-time girlfriend, Sonya Honeycutt, to break up with him. A month later, Thomas attempted to reconcile with Sonya. That night he was drinking with some friends at a local bar and called Sonya several times in an attempt to patch up their relationship. Sonya told Thomas she thought it would be best if they stayed apart until he recovered from his depression. Based on his reaction to their conversation, Sonya correctly feared he would try to commit suicide. She called her mother, who then called Thomas's parents to convey Sonya's fears about his mental and emotional state. The Sovas then got into separate cars to look for their son.

By 9:00 p.m., Thomas was drunk and decided to walk to his parents' house. No one was home when he arrived. It was at this time that Thomas apparently began harming himself. Thirty minutes later, Thomas's father returned home. Mr. Sova went around to the back of the house, walked through the screened-in porch, and found the back door to the kitchen locked. Through the door panes he saw blood on the kitchen floor. Fearing the worst, Mr. Sova ran next door and asked a neighbor to call 911 and an ambulance. The dispatcher received this call at 9:27 p.m. When Mr. Sova ran back to the house, Thomas appeared in the kitchen barechested, holding two butcher knives with blood running from gashes on his arms and chest.

Shortly thereafter, at 9:32 p.m., an ambulance and police officers Jeffrey Shell and Daniel Gaffka arrived. By this time, Thomas had moved to a window on the second floor. He broke a number of window panes with the knives and further cut himself on the broken glass as he yelled down at the police to go away. Thomas's mother arrived at this time. Noticing the tension, she attempted to defuse the situation by asking the police to leave, telling them that she and her husband could handle it. In response, the police told her they were in charge of the situation because Thomas was "ruining her windows" and "committing a crime by attempting suicide." (It is not a crime to attempt suicide in Michigan.) There is some evidence that Thomas then threatened to get a gun and that Mr. Sova told the police there were firearms in

the house. Mr. Sova denies making such a statement.

Thomas then went back downstairs and walked from the kitchen, through the porch, and onto the lawn with the knives pointing skyward. The police had not set up a perimeter, so Thomas confronted a number of people in the yard. Thomas again asked the police to leave. When Mrs. Sova tried to comfort Thomas, he avoided her and got blood on her clothes. He returned to the kitchen and slammed the door, yelling for his parents to make the police "go away." Mrs. Sova tried to follow him inside, but the police moved her away from the porch.

The situation escalated immediately after Sgt. LaLone arrived on the scene at 9:36 p.m.; he shot Thomas dead within ten minutes of his arrival. Sgt. LaLone and Officers Shell and Gaffka moved into the screened-in porch with guns drawn at 9:38 p.m. When Thomas broke the kitchen window with a knife, Sgt. LaLone asked what he wanted. Thomas replied that he wanted the police to shoot him. When he moved toward the door, the officers then began screaming at him and crouched in firing positions. Sgt. LaLone yelled that Thomas should drop the knives before he came out. Thomas pulled the kitchen door open, pushed the screen door, and stepped onto the porch still holding the knives. Officer Gaffka immediately sprayed mace in his face, forcing him to retreat. Agitated, Thomas began breaking the door panes, dragging his arms across the shards, and slashing himself on the chest and arms. Shortly thereafter, he decided to leave the kitchen again. When he pushed the screen door open, Sgt. LaLone and Officer Shell fired three times. Officer Gaffka did not fire his gun.

Two of the shots fired by Sgt. LaLone and Officer Shell struck Thomas. The first shot tore a hole in his heart. The second ripped through his right forearm. Upon impact, Thomas spun around in the doorway, stumbled through the kitchen, and collapsed in the hall. He was shot at 9:46 p.m., fourteen minutes after the first police officer had arrived on the scene. The Mt. Pleasant Police Department apparently lost the slugs that killed Thomas as well as the shell casings found on the scene. An autopsy showed Thomas's blood-alcohol level was 0.26 percent when he was shot. When the police searched the house they found several rifles laid out on the bed in the upstairs bedroom where Thomas had broken the window.

After Thomas's death, the Sovas sued the three officers, the police department, the chief of police, and the city in state court. When they amended their complaint to add a claim under 42 U.S.C. § 1983, the defendants removed the case to federal court. After extensive discovery, the defendants moved for summary judgment. The District Court granted summary judgment in favor of all the defendants after finding, as a matter of law, that the officers acted reasonably when they shot Thomas. *Sova v. City of Mt. Pleasant*, 947 F.Supp. 1116, 1122–26 (E.D.Mich.1996). Although the court specifically found Thomas was not committing a crime and was not fleeing the police when he was shot, the court determined that the threat he posed to himself in part justified the officers' use of deadly force against him.[1]

---

1. The District Court stated:

Tom Sova's interest must be balanced against the government's interest.... There is little doubt that Tom Sova was not trying to elude police. Indeed, he was approaching the police at the time of the shooting. Contrary to the statements attributed to defendant LaLone by Vickie Sova, Tom Sova was not "committing a crime" by attempting suicide. However, the police officers did appropriately remain on the scene in an attempt to control a situation involving threats to the safety of Tom Sova and those at and near the house. Section 330.1427 of the Michigan Compiled Laws Annotated provides that when a police officer observes an individual who is mentally ill or impaired and is a threat to himself or others, that officer may take that individual into protective custody. There is no genuine issue of material fact that Tom Sova had severely cut himself and was holding at least one knife at the time of the shooting. He had broken out numerous windows in plaintiffs' house with his hands and the knives. Sova was bleeding profusely, as can be seen in Exhibit 1a to defendants' motion, where blood appears above the second-story window and where blood is seen dripping down from the window. Further, defendants heard Tom Sova threaten to kill himself. Therefore, there is no genuine issue of material fact that Tom Sova appeared to be a threat to himself.

The court also emphasized how the police "were given less than fifteen minutes to take control of the situation." *Id.* at 1125. It did not acknowledge that the confrontation ended within fifteen minutes because the police shot and killed Thomas.

The court gave Sgt. LaLone and Officer Shell qualified immunity and found Officer Gaffka was not liable because he did not fire his weapon. *Id.* at 1125–26. The city, the police department, and the police chief were not liable because the court held the officers did not deprive Thomas of a constitutional right. *Id.* at 1127. Lastly, the court granted summary judgment on all the Sovas' supplemental state law claims. *Id.* at 1128–30. The Sovas appeal to this Court for reversal.

## II.

The Sovas' right to recover for the loss of their son turns upon whether Sgt. LaLone and Officer Shell are entitled to qualified immunity. Police officers are afforded qualified immunity for their discretionary functions, *Pierson v. Ray*, 386 U.S. 547, 557, 87 S.Ct. 1213, 1219, 18 L.Ed.2d 288 (1967), provided "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known," *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982). In other words, qualified immunity gives police officers "ample room for mistaken judgments" by protecting "all but the plainly incompetent or those who knowingly violate the law." *Hunter v. Bryant*, 502 U.S. 224, 229, 112 S.Ct. 534, 537, 116 L.Ed.2d 589 (1991).

Because qualified immunity is designed to reduce the "social costs ... of litigation," the Supreme Court has established detailed procedures to "dismiss[ ] ... insubstantial lawsuits without trial." *Harlow*, 457 U.S. at 814, 102 S.Ct. at 2736; *see also Mitchell v. Forsyth*, 472 U.S. 511, 526, 105 S.Ct. 2806, 2815, 86 L.Ed.2d 411 (1985) ("The entitlement is an *immunity from suit* rather than a mere defense to liability; ... it is effectively lost if a case is erroneously permitted to go to trial."). Therefore, immu-

nity is a threshold question that the District Court should resolve as early as possible. *Harlow*, 457 U.S. at 818, 102 S.Ct. at 2738. "Unless the plaintiff's allegations state a claim of violation of clearly established law, a defendant pleading qualified immunity is entitled to dismissal before the commencement of discovery." *Mitchell*, 472 U.S. at 526, 105 S.Ct. at 2815. "Even if the plaintiff's complaint adequately alleges the commission of acts that violated clearly established law, the defendant is entitled to summary judgment if discovery fails to uncover evidence sufficient to create a genuine issue as to whether the defendant in fact committed those acts." *Id.* In other words, the defendant is entitled to summary judgment unless the plaintiff can show the defendant's actions violated clearly established law at the time. *Id.* at 528, 105 S.Ct. at 2816–17; *Anderson v. Creighton*, 483 U.S. 635, 641, 107 S.Ct. 3034, 3039–40, 97 L.Ed.2d 523 (1987).

In the present case, the District Court apparently concluded that the immunity question was not clear-cut because the court allowed the parties to conduct extensive discovery. The discovery depositions, affidavits, exhibits, and other material demonstrate clearly that the two sides do not agree on the facts. The police officers claim Thomas threatened to get a gun and then charged at them through the kitchen door with knives drawn on the porch. The Sovas deny this version of what happened. They claim Thomas never said anything about a gun and was shot before he ever stepped out of the kitchen doorframe. Our resolution of this case therefore turns upon whether it was proper for the District Court to grant the officers qualified immunity in the face of such a factual dispute.

Qualified immunity in cases involving claims of deadly force is difficult to determine on summary judgment because liability turns upon the Fourth Amendment's reasonableness test. Under *Tennessee v. Garner*, 471 U.S. 1, 105 S.Ct. 1694, 85 L.Ed.2d 1 (1985), the police may not use deadly force against a citizen unless "the officer has probable cause to believe that the suspect poses a

significant threat of death or serious physical injury to the officer or others." *Id.* at 3, 105 S.Ct. at 1697. The proper application of Fourth Amendment reasonableness "requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham v. Connor,* 490 U.S. 386, 396, 109 S.Ct. 1865, 1871–72, 104 L.Ed.2d 443 (1989). This is an objective test, to be "judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight," *id.,* and making "allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation," *id.* at 397, 109 S.Ct. at 1872. Thus, in a civil suit arising from the use of deadly force, the police "[d]efendants will not be immune if, on an·objective basis, it is obvious that no reasonably competent officer would have [shot the victim]; but if officers of reasonable competence could disagree on this issue, immunity should be recognized." *Malley v. Briggs,* 475 U.S. 335, 341, 106 S.Ct. 1092, 1096, 89 L.Ed.2d 271 (1986). The central legal question is whether a reasonably well-trained officer in the defendant's position would have known that shooting the victim was unreasonable in the circumstances. *Id.* at 345, 106 S.Ct. at 1098.

■ This Court has established that summary judgment is inappropriate where there are contentious factual disputes over the reasonableness of the use of deadly force. When "the legal question ... is completely dependent upon which view of the facts is accepted by the jury," the District Court cannot grant a defendant police officer immunity from a deadly force claim. *Brandenburg v. Cureton,* 882 F.2d 211, 215–16 (6th Cir.1989). This is because·the reasonableness of the use of force is the linchpin of the case. If the jury determines the officer shot the suspect without a reasonable belief that he posed a significant threat of death or serious physical injury to the officer or others, then the officer's actions were legally

unreasonable under the Fourth Amendment. *Id.* at 216. On the other hand, if the jury believes the officer's version of the facts and finds the officer's conduct was reasonable, then he will be entitled to qualified immunity. *Id.* Where, as here, the legal question of qualified immunity turns upon which version of the facts one accepts, the jury, not the judge, must determine liability. *See Buckner v. Kilgore,* 36 F.3d 536, 540 (6th Cir. 1994); *Adams v. Metiva,* 31 F.3d 375, 387 (6th Cir.1994); *Walton v. City of Southfield,* 995 F.2d 1331, 1342 (6th Cir.1993); *Washington v. Newsom,* 977 F.2d 991, 995–96 (6th Cir.1992); *Yates ·v. City of Cleveland,* 941 F.2d 444, 447 (6th Cir.1991). This is especially true considering that the District Court must view the facts in the light most favorable to the plaintiff on a motion for summary judgment. *See Dickerson v. McClellan,* 101 F.3d 1151, 1162 (6th Cir.1996); *Adams,* 31 F.3d at 384.

Given the parties' ·divergent views of the events surrounding this shooting, the District Court erred when it determined the officers acted reasonably as a matter of law when they shot and killed Thomas. It is clear that the court reached this decision by crediting the officers' version of the fact over the Sovas' contrary evidence of how the killing occurred. Once the court decided the ultimate question in the case—that shooting Thomas was legally reasonable—summary judgment for the police on the excessive force and state tort claims became a foregone conclusion. Because the District Court failed to view the evidence about how the shooting happened in the plaintiffs' favor and overlooked contentious factual disputes concerning the officers' actions, we conclude it was improper to grant Sgt. LaLone and Officer Shell summary judgment on the Sovas' constitutional and state tort claims. We therefore reverse summary judgment in favor of Sgt. LaLone and Officer Shell on the Sovas' deadly force and state tort claims and remand to the District Court for trial on these claims. However, because Officer Gaffka never fired his weapon, we agree summary judgment in his favor was proper.

## III.

■ As for the municipal defendants, a plaintiff who sues a city and its police department for constitutional violations under 42 U.S.C. § 1983 must establish that a governmental policy or custom caused the alleged injury. *Monell v. Dept. of Social Services of the City of New York*, 436 U.S. 658, 690–91, 98 S.Ct. 2018, 2035–36, 56 L.Ed.2d 611 (1978). When the damage was inflicted by municipal employees, such as police officers, the city can be held liable for failing to train its employees adequately. Yet in this situation, a plaintiff can establish liability "[o]nly where a municipality's failure to train its employees in a relevant respect evidences a 'deliberate indifference' to the rights of its inhabitants." *City of Canton, Ohio v. Harris*, 489 U.S. 378, 389, 109 S.Ct. 1197, 1205, 103 L.Ed.2d 412 (1989). In other words, a municipality can be liable under § 1983 only where its policies are "the moving force" behind the constitutional violation. *Monell*, 436 U.S. at 694, 98 S.Ct. at 2038. Allegations that a particular officer was improperly trained are insufficient to prove liability, as are claims that a particular injury could have been avoided with better training. *Canton*, 489 U.S. at 390–91, 109 S.Ct. at 1205–06. Moreover, to establish a valid claim for improper supervision against a city's police chief, the plaintiff must show "that the supervisor encouraged the specific incident of misconduct or in some other way directly participated in it." *Lillard v. Shelby County Bd. of Educ.*, 76 F.3d 716, 727 (6th Cir.1996); *Bellamy v. Bradley*, 729 F.2d 416, 421 (6th Cir.1984).

■ Given these standards, the District Court properly granted summary judgment to the city, the police department, and the police chief. The record shows that all the officers had received extensive training. In addition, this was only the second time Mt. Pleasant police officers had used deadly force against one of its citizens. This evidence belies any claim that the city was deliberately indifferent to the safety of its citizens. Furthermore, Police Chief Trombley neither encouraged the officers to shoot Thomas nor directly participated in his shooting. In fact, he was out of town on the day Thomas was shot. Accordingly, we affirm the District Court's grant of summary judgment in favor of Mt. Pleasant, the Mt. Pleasant Police Department, and Police Chief Trombley under § 1983.

## IV.

■ With respect to the Sovas' state constitutional claims, it appears the District Court properly entered summary judgment, but for the wrong reasons. The District Court found the Sovas could not assert valid claims under the Michigan Constitution in this case because the defendants are municipal, not state, officials. *See* 947 F.Supp. at 1129. In Michigan, "[w]here it is alleged that the state, by virtue of custom or policy, has violated a right conferred by the Michigan Constitution, governmental immunity is not available in a state court action." *Smith v. Dept. of Public Health*, 428 Mich. 540, 410 N.W.2d 749, 751 (1987), *aff'd, Will v. Michigan Dept. of State Police*, 491 U.S. 58, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989). The Michigan Supreme Court in *Smith* recognized that a plaintiff can recover "damages against the state arising from violation by the state of the Michigan Constitution ... in appropriate cases." 410 N.W.2d at 751. *Smith*, in essence, incorporated *Monell* as the standard governing recovery for all violations of Michigan's Constitution, those committed by the government as well as those caused by its employees. *See Smith*, 410 N.W.2d at 751; *Bills v. Aseltine*, 52 F.3d 596, 600–01 (6th Cir.1995); *Pleasant v. Zamieski*, 895 F.2d 272, 278 (6th Cir.1990). Contrary to the District Court's holding, some authority indicates that Michigan municipalities can also be held liable for constitutional violations, provided the plaintiff's damages were the result of an unconstitutional policy or custom. *Stamps v. City of Taylor*, 218 Mich. App. 626, 554 N.W.2d 603, 607 (1996), *appeal denied*, 568 N.W.2d 87 (Mich.1997); *but see Jones v. Powell*, 227 Mich.App. 662, 577 N.W.2d 130 (1998) (reaching the opposite conclusion without citing *Stamps*). Similarly, "where a plaintiff alleges a constitutional tort against governmental employees only, the plaintiff must show that the alleged constitutional violation occurred by virtue of a

custom or policy that the governmental employees were carrying out." *Johnson v. Wayne County*, 213 Mich.App. 143, 540 N.W.2d 66, 69–70 (1995); *but see Jones*, 577 N.W.2d at 132 (agreeing with the defendant that there should not be a cause of action for damages against individual employees but recognizing that *Johnson* held otherwise). Our unqualified statement in *Bills* that "Michigan law does not recognize a cause of action against individuals for violations of the state constitution," 52 F.3d at 600, has thus been qualified by *Johnson*.

■ In light of these standards, the District Court should have granted summary judgment in favor of all the defendants on the Sovas' claims under the Michigan Constitution, not because they are municipal parties or officials, but because no municipal policy or custom caused Thomas's death. Summary judgment in favor of Mt. Pleasant, the Mt. Pleasant Police Department, and Police Chief Trombley was proper because the record does not contain evidence sufficient to prove municipal or supervisory liability, as discussed in Part III above. Summary judgment for Sgt. LaLone and Officer Shell on the state constitutional claims (not the state tort claims or the federal § 1983 claims) was proper because the single acts of two police officers are usually insufficient to constitute governmental policy or custom. *See Bd. of County Comm'rs of Bryan County, Okla. v. Brown*, 520 U.S. 397, ——–——, ——, 117 S.Ct. 1382, 1388–89, 1394, 137 L.Ed.2d 626 (1997); *Bills*, 52 F.3d at 600–01; *Johnson*, 540 N.W.2d at 69–70.

For these reasons, we reverse and remand the federal deadly force and state tort claims against Sgt. LaLone and Officer Shell for trial, but otherwise affirm the District Court.