Edward C. NEUBURGER, Individually and as Executor of the Estate of Kathleen C. Neuburger, Plaintiff,

v.

Robert THOMPSON, et al., Defendants.

Civil Action No. 03–237 Erie.

United States District Court, W.D. Pennsylvania.

Feb. 23, 2004.

Jeffrey C.Dohrmann, Esq., Rieders, Travis, Mussina, Humphrey & Harris, Williamsport, PA, for Plaintiff.

Craig E. Maravich, Esq., Susan J. Forney, Esq., Office of the Attorney General, Pittsburgh, PA, for Defendants.

## MEMORANDUM OPINION

McLAUGHLIN, District Judge.

This civil action is brought under 42 U.S.C. § 1983 and arises out of the fatal shooting of Decedent Kathleen C. Neuburger which occurred at the hands of Pennsylvania State Trooper Robert Thompson on August 18, 2001. Plaintiff Edward C. Neuburger, acting both individually and as executor of Ms. Neuburger's estate, alleges, among other things, that Trooper Thompson and various other members of the State Police violated Ms. Neuburger's rights under the Fourth Amendment to the United States Constitution.

Presently pending before the Court in this matter is a motion by Defendants to dismiss the complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. Because we conclude that the complaint fails to state a viable cause of action under 42 U.S.C. § 1983, we will dismiss Plaintiff's federal claims. Further, we will decline to exercise supplemental jurisdiction over Plaintiff's state law claims.

## I. BACKGROUND

According to Plaintiff's complaint, at about 10:15 p.m. on the night of August 18, 2001, Ms. Neuburger was sitting at the end of a concrete jetty, approximately thirty (30) feet from the shoreline, in the Walnut Creek Access Area of Lake Erie. (Complaint at ¶¶ 13–14.) Witnesses contacted 911 to report that Ms. Neuburger was distraught and had fired one shot from a handgun into the Lake. (*Id.* at ¶¶ 15–16.) Pennsylvania State Troopers Robert Thompson, William Sibbald, James Barnes, and Mark Temel were dispatched to the scene. (*Id.* at ¶ 17.)

When the Troopers arrived on the scene at about 10:37 p.m., Ms. Neuburger was facing out across the water at the end of the jetty with her feet in the water. (*Id.* at ¶¶ 17–18.) Trooper Barnes was designated to speak with Ms. Neuburger while Defendant Thompson, armed with a shotgun, and Defendant Sibbald, armed with a semi-automatic handgun, provided cover. (*Id.* at ¶ 19.) Defendant Temel provided light from two flashlights and provided additional cover as well. (*Id.*)

The complaint alleges that the four Troopers began approaching Ms. Neuburger in the following manner. Defendant Thompson approached from left of the jetty with his shotgun pointed toward Ms. Neuburger. (Complaint at ¶ 20.) Trooper Temel was positioned behind Trooper Thompson with two flashlights in his left hand pointed toward Ms. Neuburger and a drawn semi-automatic handgun (presumably in the other hand). (*Id.*) Trooper Barnes approached Ms. Neuburger from directly behind the jetty. (*Id.*) Trooper Sibbald approached from the right of the jetty with a semi-automatic handgun drawn. (*Id.*)

As the Troopers made their approach, Ms. Neuburger appeared highly emotional and was crying unintelligibly. (*Id.* at ¶ 21.) Trooper Barnes spoke to Ms. Neuburger saying, among other things, for her to put the handgun down. (*Id.* at ¶ 22.) Ms. Neuburger told the Troopers "to get away from her and not make her do this." (*Id.* at ¶ 23.) Nevertheless, the Troopers continued to approach Ms. Neuburger in the manner indicated, with Trooper Barnes again instructing Ms. Neuburger to put her gun down. (*Id.* at ¶ 24.) Ms. Neuburger remained highly emotional and was crying unintelligibly. (*Id.* at ¶ 25.)

As the Troopers approached, Ms. Neuburger, still facing out across the water and with her feet in the water, raised her arm holding the handgun and pointed it out across the water. (*Id.* at ¶ 26.) Then, with the Troopers still approaching, Ms. Neuburger began to pivot toward Trooper Barnes with her arm holding the handgun still extended and stated, "You're making me do this." (*Id.* at ¶ 27.) Ms. Neuburger began pointing her handgun toward Trooper Barnes. (*Id.* at ¶ 28.) At that point, Trooper Thompson fired his shotgun at Ms. Neuburger, striking her in the head and neck, knocking her into the water, and causing her death. (*Id.* at ¶ 29.)

Plaintiff asserts that, in light of the geography of the location and Ms. Neuburger's position on the jetty, Ms. Neuburger was not—prior to the Troopers' approach and Ms. Neuburger's standing and turning—posing an imminent threat of death or serious bodily injury to the Troopers or anyone else in the area. (*Id.* at ¶ 30.) Plaintiff further claims that the Troopers had time to attempt to "wait out" Ms. Neuburger, employ a trained negotiator, or utilize other strategies or tactics in an attempt to apprehend Ms. Neuburger without the use of deadly force. (*Id.* at ¶ 32.) It is alleged that the Troopers' failure or refusal to take these alternative measures and their decision to instead approach Ms. Neuburger in the manner described unnecessarily and unreasonably created circumstances under which deadly force was utilized. (*Id.* at ¶¶ 31, 33–34.)

Plaintiff has asserted numerous causes of action premised upon the foregoing averments. Under Counts I and II of his complaint, Plaintiff asserts that Troopers Thompson, Sibbald, Barnes, and Temel (the "on-scene officers") violated, respectively, Ms. Neuburger's federal and state constitutional rights to be free from an unreasonable seizure by affirmatively engaging in—and/or by failing or refusing to stop—the use of unreasonable and/or excessive force. In Counts III and IV, Plaintiff asserts that Erby Conley (then Commander of Troop E, Pennsylvania State Police) and Michael Hample (Captain of Trooper E) violated, respectively, Ms. Neuburger's federal and state constitutional rights to be free from unreasonable seizure by failing or refusing to provide the on-scene officers with appropriate supervision and training regarding the seizing of individuals under the kind of circumstances involved in this case. Counts V through VII assert additional state law claims on behalf of both Ms. Neuburger and the Plaintiff.

Defendants ask this Court to dismiss the federal claims on the ground that Plaintiff has not adequately pleaded a violation of Ms. Neuburger's federal constitutional rights for purposes of § 1983. Alternatively, Defendants assert that they are entitled to qualified immunity as to these claims. Defendants also seek a dismissal of the state law claims for lack of supplemental jurisdiction. The motion has been fully briefed and argued and is now ripe for adjudication.

## II. STANDARD OF REVIEW

In reviewing a motion to dismiss under Fed.R.Civ.P. 12(b)(6), we accept all well-pleaded allegations in the complaint as true and draw all reasonable inferences in favor of the plaintiff. *M.A. ex rel. E.S. v. State–Operated School Dist. of City of Newark,* 344 F.3d 335, 340 (3d Cir.2003). We may dismiss a claim only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations. *Doe v. Delie,* 257 F.3d 309, 313 (3d Cir.2001) (citing *Hishon v. King & Spalding,* 467 U.S. 69, 73, 104 S.Ct. 2229, 81 L.Ed.2d 59 (1984)).

## III. DISCUSSION

### A.

Because our ruling on Plaintiff's § 1983 claims is dispositive, we address those issues initially. We first consider Plaintiffs' § 1983 claim against the on-scene officers. We then consider the § 1983 claim against Defendants Conley and Hample, whom Plaintiff seeks to hold liable in their supervisory capacities.

1. *Defendants Thompson, Sibbald, Barnes and Temel*

 a.) *Can Plaintiff Establish a Violation of Ms. Neuburger's Constitutional Rights?*

■ In order to recover under 42 U.S.C. § 1983[1], a plaintiff must show that the defendant, while acting under color of state law, subjected the plaintiff to a deprivation of a right, privilege, or immunity secured by the constitution or laws of the United States. *Renda v. King*, 347 F.3d 550, 557 (3d Cir.2003). Police officers who violate an individual's federal constitutional or statutory rights while acting under color of state law are subject to liability under § 1983. *Curley v. Klem*, 298 F.3d 271, 277 (3d Cir.2002).

■ Plaintiff has asserted that the on-scene officers violated Ms. Neuburger's Fourth Amendment Right to be free from "unreasonable seizures." In so pleading, however, Plaintiff likens his Fourth Amendment claim to a theory of "state created danger," a doctrine applicable under Fourteenth Amendment substantive due process principles. As a beginning point, therefore, we must determine which of Ms. Neuburger's constitutional rights are implicated under the facts of this case and then determine whether Plaintiff has adequately alleged a constitutional violation.

■ The Supreme Court has made clear that, where the alleged use of excessive force occurs in the context of an arrest, investigatory stop, or other "seizure" of a free citizen,[2] the claim must be analyzed under the "objective reasonableness" standard of the Fourth Amendment. *Graham v. Connor*, 490 U.S. 386, 395, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989). Pursuant to this standard, we inquire whether the officers' actions in utilizing force were objectively reasonable in light of the facts and circumstances confronting them, regardless of their underlying intent or motivation. *Curley*, 298 F.3d at 279 (citing *Graham*, 490 U.S. at 397, 109 S.Ct. 1865).

■ Determining whether an officer's use of deadly force was "objectively reasonable" necessitates a "careful balancing

---

1. Section 1983 provides, in relevant part, that "[e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress ..." 42 U.S.C. § 1983.

2. A "seizure" triggering the Fourth Amendment's protections occurs only when government actors have, "by means of physical force or show of authority, ... in some way restrained the liberty of a citizen." *Graham*, 490 U.S. at 395 n. 10, 109 S.Ct. 1865 (quoting *Terry v. Ohio*, 392 U.S. 1, 19, n. 16, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968)). There is no question that a "seizure" occurred in the context of this case. *See Abraham v. Raso*, 183 F.3d 279, 288 (3d Cir.1999) ("[T]here can be no question that apprehension by the use of deadly force is a seizure subject to the reasonableness requirement of the Fourth Amendment.") (quoting *Tennessee v. Garner*, 471 U.S. 1, 7, 105 S.Ct. 1694, 85 L.Ed.2d 1 (1985)).

of 'the nature and quality of the intrusion on the individual's Fourth Amendment interests' against the countervailing governmental interests at stake." *Graham*, 490 U.S. at 396, 109 S.Ct. 1865 (quoting *Tennessee v. Garner*, 471 U.S. 1, 8, 105 S.Ct. 1694, 85 L.Ed.2d 1 (1985)). This inquiry "is not capable of precise definition or mechanical application," *id.* (quoting *Bell v. Wolfish*, 441 U.S. 520, 559, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979)), and instead "requires careful attention to the facts and circumstances of each particular case." *Id.* Among the factors we consider are:

> the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he actively is resisting arrest or attempting to evade arrest by flight, *see Graham*, 490 U.S. at 396, 109 S.Ct. at 1872, as well as the possibility that the persons subject to the police action are themselves violent or dangerous, the duration of the action, whether the action takes place in the context of effecting an arrest, the possibility that the suspect may be armed, and the number of persons with whom the police officers must contend at one time, *see Sharrar v. Felsing, 128 F.3d 810, 822 (3d Cir.1997).*

*Smith v. Marasco*, 318 F.3d 497, 515 (3d Cir.2003). In assessing the "reasonableness" of a particular use of force, we must consider the circumstances "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham*, 490 U.S at 396, 109 S.Ct. 1865 (*citing Terry v. Ohio*, 392 U.S. at 20–22, 88 S.Ct. 1868). Moreover, "[t]he calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a

particular situation." *Graham*, 490 U.S. at 396–97, 109 S.Ct. 1865.

Here, Plaintiff does not complain that the shooting, when viewed in a vacuum, was excessive. That argument would be dubious in any event, given the allegation that Trooper Thompson shot Ms. Neuburger only after she had ignored repeated commands to drop her handgun, was observed pointing it at Trooper Barnes, and stated (while in a highly emotional state), "You're making me do this." Assuming these facts, it would be reasonable for any officer to believe that Ms. Neuburger posed an imminent threat to Trooper Barnes's safety at the moment she was shot.

Nevertheless, Plaintiff complains that the on-scene officers' conduct antecedent to the shooting unreasonably provoked a confrontation with Ms. Neuburger which then created the need to use deadly force, thus rendering the shooting unreasonable under the totality of circumstances. In *Abraham v. Raso*, 183 F.3d 279 (3d Cir. 1999), the Third Circuit ruled that, in considering whether an officer's use of force is reasonable under the "totality of circumstances," the fact-finder could consider events preceding the actual "seizure." *Id.* at 291–92. At the same time, the Court acknowledged that "pre-seizure" events might or might not be relevant to this determination, depending on the circumstances of the case. *Id.* at 292 ("We are not saying, of course, that all preceding events are equally important, or even of any importance. Some events may have too attenuated a connection to the officer's use of force."). The Court declined to decide (because it had no need to do so) the extent to which an officer's actions in unreasonably creating *a need* to use deadly force in self-defense might result in a Fourth Amendment violation. *Id.* at 295–96.

Like Judge Becker, *see Grazier v. City of Philadelphia*, 328 F.3d 120, 129–30 (3d Cir.2003) (Becker, C.J., dissenting), we are willing to accept the principle that such conduct on the part of a police officer "may render the eventual use of deadly force by the officer unreasonable in violation of the Fourth Amendment, even if the officer reasonably believed that such force was necessary to prevent death or severe bodily injury" at the moment it was employed. *Id.* Nevertheless, viewing the totality of the circumstances as alleged in the Complaint, we find that Plaintiff has failed to plead objectively unreasonable conduct on the part of the on-scene officers for purposes of establishing a Fourth Amendment violation.

Plaintiff contends that, prior to the officers' approach, Ms. Neuburger was not presenting a threat to anyone in that she was sitting at the end of a 30–foot jetty, facing the Lake, with her feet in the water. By confronting Ms. Neuburger with drawn guns, shining a light upon her, and issuing commands, it is alleged, the on-scene officers unnecessarily and unreasonably provoked her. In essence, Plaintiff seems to criticize both the officers' decision to approach Ms. Neuburger and the manner in which their approach was carried out.

We cannot agree that the on-scene officers acted in an objectively unreasonable manner in determining to confront and disarm Ms. Neuburger. The complaint illustrates that Troopers Thompson, Barnes, Sibbald and Temel were dispatched to the scene after concerned witnesses had observed Ms. Neuburger acting distraught and firing a live round into the Lake. Upon their arrival, Ms. Neuburger continued to appear highly emotional and was crying unintelligibly. In light of these facts, the on-scene officers had probable cause to arrest Ms. Neuburger[3] and/or take her into protective custody. Given Ms. Neuburger's highly emotional state and her possession of a loaded handgun, reasonable officers could have believed that Ms. Neuburger might cause harm to herself[4] or possibly others. While Plaintiff makes much of the fact that Ms. Neuburger was located at the end of a 30–foot jetty, it must be noted that the jetty is located in a public access area and it would be reasonable to assume that Ms. Neuburger's handgun was capable of firing well beyond

---

3. It is not clear from the complaint whether the on-scene officers intended to arrest Ms. Neuburger on criminal charges, detain her for further investigation, or merely take her into protective custody. Based on the events as alleged, however, the on-scene officers had probable cause to arrest Ms. Neuburger for—at the very least—disorderly conduct. *See* 18 Pa. Cons.Stat. Ann. § 5301(a) ("A person is guilty of disorderly conduct if, with intent to cause public inconvenience, annoyance or alarm, or recklessly creating a risk thereof, he: (1) engages in fighting or threatening, or in violent or tumultuous behavior; (2) makes unreasonable noise; (3) uses obscene language, or makes an obscene gesture; or (4) creates a hazardous or physically offensive condition by any act which serves no legitimate purpose of the actor.").

4. Plaintiff cites *Bennett v. Murphy*, 274 F.3d 133 (3d Cir.2002), for the proposition that, if

Ms. Neuburger posed a threat only to herself, then it was unreasonable for officers to use deadly force against her. *See id.* at 136 ("If ... David Bennett had stopped advancing and did not pose a threat to anyone but himself, the force used against him, i.e. deadly force, was objectively excessive."). True enough, if—at the moment Trooper Thompson shot Ms. Neuburger—she was not posing a threat to anyone other than herself, then the deadly shotgun blast would be objectively excessive. However, that is not the case here, as it is alleged that Trooper Thompson shot Ms. Neuburger only after she had pointed her own handgun at Trooper Barnes. We do not read *Bennett* as holding that armed officers may never approach or attempt to subdue an emotionally distraught person in possession of a handgun.

thirty-feet in the event she chose to use it. Although it was nighttime, there were obviously other persons close enough in the vicinity to have observed Ms. Neuburger's actions, as demonstrated by the 911 call. The fact that it was dark added further uncertainty to the situation because reasonable officers on the scene could not have been certain whether other individuals might still be in the area. Given all of the "unknown" factors confronting the on-scene officers, it was reasonable for them to conclude that affirmative action was appropriate in order to diffuse the situation as expeditiously as possible. Consequently, even though Ms. Neuburger was located at the end of a jetty and had no immediate means of escaping, the officers acted reasonably in attempting to disarm and subdue her.

Moreover, the manner in which the on-scene officers approached Ms. Neuburger was not inappropriate under the circumstances. The four Troopers on scene did not constitute an overwhelming show of force, although Ms. Neuburger was the only individual with whom they ostensibly had to contend. Crediting Plaintiff's allegations as true, Trooper Barnes (the officer designated to speak to Ms. Neuburger) was not overly hostile or belligerent in his tone, as it is alleged merely that he "spoke to [Ms. Neuburger] saying, among other things, for her to put the handgun down" and "continued telling [her] to put her gun down." (Complaint at ¶¶ 22, 24.) It also appears from the Plaintiff's allegations that Trooper Barnes did not have a weapon drawn as he approached her. Moreover, reasonable officers on the scene would have found it necessary and appropriate to provide cover for their fellow officer as he approached Ms. Neuburger. In order to provide effective cover for Trooper Barnes, who was attempting to confront an armed and "highly emotional" individual (and one who was disregarding repeated instructions to put down her gun), the other on-scene officers approached Ms. Neuburger from two separate angles with their weapons drawn and Trooper Temel's flashlights illuminating her. We conclude as a matter of law that the officers' display of force was not unreasonable under these circumstances.

In opposing the Defendants' Rule 12(b)(6) motion, the Plaintiff relies heavily on *Smith v. Marasco*, 318 F.3d 497 (3d Cir.2003), which we find factually distinguishable. *Marasco* involved a case where state troopers called in a Special Emergency Response Team (SERT) in order to flush the decedent (Smith) from his house after perceiving that Smith was in possession of a laser-sighted firearm and had pointed the weapon at one of the officers present in Smith's yard. Activation of the SERT resulted in the deployment of approximately 30 officers (including a sharpshooter and a helicopter unit), armed and dressed in riot gear and camouflage, surrounding Smith's house and cutting off his contact with family and friends. In attempting to apprehend Smith, the SERT team had employed rocks, tear gas, and "flash-bang" distraction devices. Smith's decomposed body was subsequently found in the woods near his house and the plaintiff's forensic pathologist opined that he had likely died as a result of a fatal heart attack brought on by the stress of the incident. There was evidence in *Marasco* that certain of the officers had been aware that Smith, a Vietnam veteran, had fragile emotional and physical health and suffered from coronary heart disease, post traumatic stress disorder, and flashbacks.

In finding that there was a triable issue as to whether the officers violated Smith's Fourth Amendment rights, the *Marasco* Court focused upon several factors. The court acknowledged that Smith's known mental instability and possession of weap-

ons were factors favoring the use of force. However, there were numerous factors that counseled against the use of the SERT, *to wit:* the police were initially on Smith's premises in response to a rather minor complaint,[5] there was no indication that Smith had ever used a gun violently or that he had used a firearm recently, Smith had no known history of violence, Smith was the only person with whom the state troopers had to contend, no arrest was made (nor were the police initially in possession of an arrest warrant), and the incident had played out over the course of several hours. In addition to the foregoing, the plaintiff's expert in police practices had opined that the police responded unreasonably to a situation involving a known emotionally disturbed person, and there was also evidence that SERT activation was unwarranted under the SERT's own procedural guidelines. The *Marasco* Court cited to the Tenth Circuit's opinion in *Holland v. Harrington,* 268 F.3d 1179 (10th Cir.2001) in observing that:

> [t]he decision to deploy a SWAT team to execute a warrant necessarily involves the decision to make an overwhelming show of force—force far greater than that normally applied in police encounters with citizens. Indeed, it is the SWAT team's extraordinary and overwhelming show of force that makes "dynamic entry" a viable law enforcement tactic in dealing with difficult and dangerous situations . . .
>
> . . . If anything, the special circumstances and greater risks that warrant "dynamic entry" by a SWAT team call for *more* discipline, control, mindfulness,

and restraint on the part of law enforcement, not less. . . .

*Marasco,* 318 F.3d at 517–18 (quoting *Holland,* 268 F.3d at 1190–95).

We find the facts involved in *Marasco* to be fundamentally distinguishable from the facts involved in this case and, consequently, we find no inconsistency between the holding in that case and our ruling in the case at bar. Admittedly, like the officers in *Marasco,* the State Troopers here were required to contend with only one person. But as was true in *Marasco,* Ms. Neuburger's apparent instability and simultaneous possession of a loaded weapon are factors supporting the use of deadly force. In addition, unlike the decedent in *Marasco,* Ms. Neuburger had recently fired her handgun, albeit into the Lake. Moreover, unlike *Marasco,* this case does not involve an "extraordinary and overwhelming show of force" by the on-scene officers. Trooper Barnes, while presumably armed, is not alleged to have had his weapon drawn during his attempt to confront Ms. Neuburger. He allegedly "spoke" to her and told her repeatedly to put her handgun down, but those instructions went unheeded. According to Plaintiff's own allegations, the other three troopers had their weapons drawn for the purpose of providing "cover" to Trooper Barnes, an essentially defensive posture. Their decision to cover their fellow officer was not only reasonable, but imperative, given the uncertainties with which they were faced. Trooper Temel's conduct in illuminating Ms. Neuburger with his flashlights was equally imperative in order to provide effective cover to Trooper Barnes. Finally, unlike the situation in *Marasco,* the critical

---

**5.** The police proceeded to Smith's house to investigate a complaint lodged by his neighbor, Shafer, with whom Smith had had an ongoing dispute. There were contradictions in the record as to the nature of Shafer's complaint. One account suggested that Shaf-

er had complained about his lights being shot out, while written reports suggested that Shafer had complained that a light from Smith's property was shining on Shafer's property. *See* 318 F.3d at 502 n. 1.

events here did not span the course of many hours. For all of these reasons, we conclude that the conduct of Troopers Thompson, Sibbald, Barnes, and Temel as alleged in the complaint is fundamentally distinguishable from the conduct complained of in *Marasco* and cannot support a finding of a Fourth Amendment violation.

Plaintiff insists that the on-scene officers should have pursued an alternative course of conduct that did not involve the use of deadly force, such as "waiting Ms. Neuburger out," calling in a training negotiator, or attempting to locate family or friends who could speak to Ms. Neuburger. However, "(t)he Fourth Amendment does not require officers to use the least intrusive or even less intrusive alternatives in search and seizure cases." *Estate of Fortunato v. Handler*, 969 F.Supp. 963, 972 (W.D.Pa. 1996). Moreover, engaging in retroactive speculation about whether alternative courses of action might have been more productive requires us to indulge in exactly the kind of "Monday morning quarterbacking" that is forbidden by our Fourth Amendment jurisprudence. *See Fortunato*, 969 F.Supp. at 972 (quoting *In re City of Philadelphia Litig.*, 49 F.3d 945 (3d Cir.1995)) ("[I]t is not the province of the courts in scrutinizing alleged police misconduct to provide alternatives to unlawful police action. Instead, we are to evaluate the lawfulness of what *did* occur.") (emphasis in the original). *See also Plakas v. Drinski*, 19 F.3d 1143, 1149–50 (7th Cir. 1994) ("We do not return to the prior segments of the event and, in light of hindsight, reconsider whether the prior po-

lice decisions were correct. Reconsideration will almost always reveal that something different could have been done if the officer knew the future before it occurred. This is what we mean when we say we refuse to second-guess the officer.")

██ In arguing the vitality of his claim, Plaintiff likens his Fourth Amendment theory to the "state-created danger" theory of liability that is applied in the context of alleged 14th Amendment violations. Under the state-created danger theory, a plaintiff can establish a violation of his substantive due process rights by demonstrating that: (1) the harm ultimately caused by the state actor was foreseeable and fairly direct; (2) the state actor acted in willful disregard for the safety of the plaintiff; (3) there existed some relationship between the state and the plaintiff such that the plaintiff was a foreseeable victim; and (4) the state actors used their authority to place the plaintiff in a dangerous position that was foreseeable. *See Marasco*, 318 F.3d at 506–07 (citations omitted). In such cases, "liability attaches only to conduct that 'shocks the conscience.'" *Id.* (citing *County of Sacramento v. Lewis*, 523 U.S. 833, 845, 118 S.Ct. 1708, 140 L.Ed.2d 1043 (1998)). Plaintiff submits that the precise degree of wrongfulness required to reach the conscience-shocking level in the context of this case is "gross negligence or arbitrariness" on the part of the Defendant officers. *Id.* at 508–09.

Assuming for present purposes that the state-created danger theory has relevance in this civil action,[6] we find Plaintiff's alle-

---

**6.** At oral argument, this Court was inclined to view the case at bar as more appropriately analyzed under the state-created danger paradigm than traditional Fourth Amendment principles, given Plaintiff's focus on the alleged unreasonableness of the on-scene officers' conduct prior to the shooting. On fur-

ther reflection, it is questionable whether *Graham v. Connor* even permits consideration of a state-created danger theory in the context of this case. *See id.*, 490 U.S. at 395, 109 S.Ct. 1865 ("[A]ll claims that law enforcement officers have used excessive force— deadly or not—in the course of an arrest,

gations insufficient to state a viable claim under that theory. Fundamentally, we conclude that the factual assertions in the complaint, even if accepted as true, fail to allege conduct on the part of the on-scene Defendants rising to the level of "gross negligence or arbitrariness" that "shocks the conscience." While we recognize that the Third Circuit in *Marasco* found issues of fact relative to the plaintiff's substantive due process claim, we find that authority to be factually distinguishable and therefore not controlling in the case at bar for the reasons previously discussed.

In sum, we conclude as a matter of law that the fatal shooting of Ms. Neuburger—though undeniably tragic—did not amount to an "unreasonable seizure" in light of the totality of alleged circumstances. We find that the alleged conduct of the on-scene officers antecedent to the shooting was not unreasonable or excessive under the circumstances and that no rational fact-finder would be justified in concluding otherwise. We also conclude that the allegations do not establish a constitutional violation under the state-created danger theory.

Plaintiff therefore cannot state a viable claim under § 1983.[7]

*b.) Are the On-scene Officers Alternatively Entitled to Qualified Immunity?*

Defendants have alternatively asserted that they are entitled to qualified immunity even if a constitutional violation can be established. Although we need not reach this issue, in the interest of judicial economy we find it prudent to do so.

The doctrine of qualified immunity recognizes "the need to protect officials who are required to exercise their discretion and the related public interest in encouraging the vigorous exercise of official authority." *Butz v. Economou*, 438 U.S. 478, 98 S.Ct. 2894, 57 L.Ed.2d 895 (1978). Consistent with this goal, qualified immunity is "an entitlement not to stand trial or face the other burdens of litigation." *Bennett v. Murphy*, 274 F.3d 133, 136 (3d Cir.2002) (quoting *Saucier v. Katz*, 533 U.S. 194, 121 S.Ct. 2151, 2156, 150 L.Ed.2d 272 (2001)). Because the privilege is "an immunity from suit rather than a mere defense to

investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard, rather than under a 'substantive due process' approach. because the Fourth Amendment provides an explicit textual source of constitutional protection against this sort of physically intrusive governmental conduct, that Amendment, not the more generalized notion of 'substantive due process,' must be the guide for analyzing these claims.") (emphasis in the original). For present purposes, we assume that it does.

7. Our circuit has instructed that "reasonableness" for purposes of Fourth Amendment jurisprudence "resembles tort law in its attention to how a specific, concrete circumstance should affect an officer's judgment" and, thus, "reasonableness under the Fourth Amendment should frequently remain a question for the jury." *Abraham v. Raso*, 183 F.3d at 289–90. Nevertheless, a defendant can still pre-

vail on summary judgment "if the district court concludes, after resolving all factual disputes in favor of the plaintiff, that the officer's use of force was objectively reasonable under the circumstances." *Id.* at 290 (quoting *Scott v. Henrich*, 39 F.3d 912, 915 (9th Cir.1994)). Although Plaintiff's claims are being judged not under Rule 56 but on the sufficiency of his allegations under Rule 12(b)(6), we conclude that the Defendants are entitled to a dismissal of the complaint because, giving full credit to Plaintiff's allegations, no fact-finder would be justified in concluding that the on-scene officers acted in an objectively unreasonable manner in violation of the Fourth Amendment. *See Curley v. Klem*, 298 F.3d 271, 279 (3d Cir.2002) (suggesting it is not inappropriate for a judge to decide the objective reasonableness of an officer's actions once when historical facts are not disputed).

liability," it is "effectively lost if a case is erroneously permitted to go to trial." *Id.* Accordingly, we are charged with resolving qualified immunity issues "at the earliest possible stage in the litigation." *Id.* *See also Sova v. City of Mt. Pleasant,* 142 F.3d 898, 902 (6th Cir.1998) ("Unless the plaintiff's allegations state a claim for the violation of clearly established law, a defendant pleading qualified immunity is entitled to dismissal before the commencement of discovery.") (quoting *Mitchell v. Forsyth,* 472 U.S. 511, 526, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985)).

■ The Supreme Court directed in *Saucier v. Katz,* 533 U.S. 194, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001) that claims of qualified immunity must be evaluated using a two-step process. First, the court must determine whether the facts, taken in the light most favorable to the plaintiff, show a constitutional violation. If the plaintiff fails to make out a constitutional violation, the qualified immunity inquiry is at an end and the officer is entitled to immunity. *Bennett,* 274 F.3d at 136. If, on the other hand, the plaintiff has adduced evidence of a constitutional violation, the court must proceed to the second step of the analysis and determine whether the constitutional right was clearly established. *Id.* Otherwise stated, the court must ask itself if, in the factual scenario established by the plaintiff, a reasonable police officer would have understood that his actions were prohibited. *Id.* "If it would not have been clear to a reasonable officer *what the law required* under the facts alleged, he is entitled to qualified immunity." *Id.* (emphasis in original). The doctrine thus affords police officers "ample room for mistaken judgments" by protecting "all but the plainly incompetent or those who knowingly violate the law." *Sova,* 142 F.3d at 902 (quoting *Hunter v. Bryant,* 502 U.S. 224, 229, 112 S.Ct. 534, 116 L.Ed.2d

589 (1991)). On the other hand, "[i]f the requirements of the law would have been clear, the officer must stand trial." *Bennett,* 274 F.3d at 136.

■ Even assuming that the alleged conduct of the on-scene officers constituted a violation of Ms. Neuburger's Fourth Amendment rights, we would conclude that the officers are entitled to qualified immunity. As our previous discussion illustrates, Plaintiff has sought to hold the on-scene officers liable on the theory that their conduct *prior* to the fatal shooting was unreasonable and unnecessarily precipitated the need for their use of deadly force. In *Abraham v. Raso,* 183 F.3d 279 (3d Cir.1999), the Third Circuit recognized a split of authority among other circuits relative to this sort of theory, but it declined to attempt to resolve this discrepancy:

> We note that a number of courts have refused to find officers liable based on their lapses in following police department procedures, even though those lapses may have contributed to the use of force. *See, e.g., Drewitt v. Pratt,* 999 F.2d 774, 779–80 (4th Cir.1993); *Fraire v. City of Arlington,* 957 F.2d 1268, 1275–76 (5th Cir.1992). By contrast, where an officer's conduct amounted to more than a minor departure from internal department policy, and in particular where the officer engaged in intentional misconduct, courts have found that the officer's acts creating the need for force are important in evaluating the reasonableness of the officer's eventual use of force. *See, e.g., Gilmere v. City of Atlanta,* 774 F.2d 1495, 1501–02 (11th Cir. 1985) (en banc). Similarly, in *Estate of Starks v. Enyart,* 5 F.3d 230, 234 (7th Cir.1993), the court concluded that if an officer jumped in front of the decedent's car after the car began accelerating, the officer "would have unreasonably creat-

ed the encounter that ostensibly permitted the use of deadly force." We will leave for another day how these cases should be reconciled.

183 F.3d at 295–96. Subsequently, in *Grazier v. City of Philadelphia*, 328 F.3d 120 (3d Cir.2003), then Chief Judge Becker noted in his dissenting opinion that *Raso* "left open ... the question of how much weight an *officer's* unreasonable creation of danger should be given in the calculus of whether the officer's use of force was ultimately reasonable under the Fourth amendment." *Id.* at 129 (Becker, C.J., dissenting) (emphasis in original). Although Chief Judge Becker was inclined to reach that issue in *Grazier*, the majority panel considered it unnecessary in light of the procedural posture of that appeal.

Given the unsettled state of the law relative to Plaintiff's theory of Fourth Amendment liability, we cannot say that the complaint states a violation of clearly established law. Simply stated, we do not believe that the body of Fourth Amendment jurisprudence was sufficiently developed as of August 18, 2001 such that reasonable officers in the position of Troopers Thompson, Sibbald, Barnes and Temel would have understood their conduct to be unlawful.

While Plaintiff relies on *Smith v. Marasco, supra,* and *Bennett v. Murphy,* 274 F.3d 133 (3d Cir.2002) in support of her Fourth Amendment and "state created danger" theories, those decisions were rendered subsequent to the events of August 18, 2001 and therefore cannot form part of the body of "clearly established constitutional principles" which the on-scene officers allegedly violated. Plaintiff also relies on *Raso* and *Graham v. Connor* as authority establishing Ms. Neuburger's clearly established right to be free from excessive force. Without further elaborating, we will simply note that the facts of those cases are sufficiently distinguishable from the alleged facts at bar such that those cases do not clearly establish the principles of liability upon which Plaintiff's § 1983 claim is premised. Accordingly, dismissal of Count 1 is appropriate on the alternative basis of qualified immunity.

### 2. Defendants Conley and Hample

■ Plaintiff also attempts to state a § 1983 claim against Defendants Conley and Hample, in both their individual and official capacities, based upon allegedly unconstitutional conduct undertaken by them in their supervisory capacities. The relevant allegations set forth in Count III are as follows:

* Defendants Conley and Hample were charged with the responsibility of providing the on-scene officers with appropriate supervision and training regarding the seizing of individuals under circumstances similar to those involved in this case (Complaint ¶ 46);

* Defendants Conley and Hample failed or refused to provide the on-scene officers with the appropriate supervision and training (*Id.* at ¶ 47);

* Defendants Conley and Hample thereby pursued a practice, policy and custom of not providing such appropriate supervision and training (*Id.* at ¶ 48);

* the on-scene officers' use of allegedly excessive force was reasonably foreseeable to Defendants Conley and Hample and were the proximate result of Conley and Hample's conduct (*Id.* at ¶¶ 49–50, 53); and

* Defendants Conley and Hample acted with deliberate indifference to Ms. Neuburger's right to be free from excessive and unreasonable force (*Id.* at ¶ 51).

Because we have found that the alleged conduct of the on-scene officers did not

violate Ms. Neuburger's constitutional rights, it follows perforce that no § 1983 claim can be stated against Defendants Conley and Hample for their alleged failure to properly train and supervise the on-scene officers. *See Taylor v. Garwood,* 98 F.Supp.2d 672, 680 (E.D.Pa.2000) (*Bivens* action) (citing *Baker v. Monroe Township,* 50 F.3d 1186, 1190–91, 1191 n. 5 (3d Cir. 1995)), *aff'd,* 275 F.3d 38 (2001) (Table No. 00–2715).

■■■■■ However, even if Plaintiff *could* establish a constitutional violation on the part of the on-scene officers, his claim against Defendants Conley and Hample fail for alternative reasons. Third Circuit case law recognizes that "(a) defendant in a civil rights action must have personal involvement in the alleged wrongs" in order to be liable. *Sutton v. Rasheed,* 323 F.3d 236, 249 (3d Cir.2003) (citing *Rode v. Dellarciprete,* 845 F.2d 1195, 1207 (3d Cir. 1988)). Consequently, a supervisor may be liable under 42 U.S.C. § 1983 for his or her subordinate's unlawful conduct if he or she directed, encouraged, tolerated, or acquiesced in that conduct. *See Blanche Road Corp. v. Bensalem Twp.,* 57 F.3d 253, 263 (3d Cir.1995); *Baker v. Monroe Twp.,* 50 F.3d 1186, 1190–91 (3d Cir.1995). However, the mere assertion "that the constitutionally cognizable injury would not have occurred if the superior had done more than he or she did" is insufficient to establish liability. *Sample v. Diecks,* 885 F.2d 1099, 1118 (3d Cir.1989). Likewise, a supervisor's mere failure to train, supervise or discipline subordinate officers does not state a basis for a § 1983 claim against the supervisor absent proof of direct participation by the superior in some unlawful conduct. *Mobley v. City of Atlantic City Police Dept.,* No. Civ. A. 97–2086JBS, 2000 WL 363692 at *3 (D.N.J. March 30, 2000) (citing *Brown v. Grabowski,* 922 F.2d 1097, 1119–20 (3d Cir.1990)).

Plaintiff concedes that he cannot establish a claim against Defendants Conley and Hample in their individual capacities consistent with the foregoing principles. Nevertheless, Plaintiff maintains that he has stated a viable claim against Conley and Hample in their official capacities based on their alleged failure to properly train and supervise the on-scene officers. In support of this proposition, Plaintiff relies on *City of Canton v. Harris,* 489 U.S. 378, 388, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989) ("[T]he inadequacy of police training may serve as a basis for § 1983 liability only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact.") and *Groman v. Twp. of Manalapan,* 47 F.3d 628, 637 (3d Cir.1995) ("This deliberate indifference standard [also] applies to . . . allegations of negligent supervision and failure to investigate.").

■■■■ Plaintiff's reliance on *City of Canton* and *Groman* is misplaced, however. Those cases address the potential liability of municipalities under § 1983 for alleged policies or customs that display deliberate indifference to the deprivation of a person's constitutional rights. While municipalities are "persons" who may be held liable under § 1983, states and state agencies are not "persons" subject to § 1983 liability. *See Will v. Michigan Dept. of State Police,* 491 U.S. 58, 71, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989). As Plaintiff accurately observes, official capacity suits generally represent an action against an entity of which an officer is an agent. *See id.; Monell v. New York Dept. of Social Serv.,* 436 U.S. 658, 690 n. 55, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). Thus, claims against state officials in their official capacities are treated as claims against the state itself and cannot be brought under § 1983. *Hafer v. Melo,* 502 U.S. 21, 25, 112 S.Ct. 358, 116 L.Ed.2d 301 (1991);

*Will,* 491 U.S. at 71, 109 S.Ct. 2304. Aside from failing to name a proper "person" for § 1983 liability purposes, such claims are barred by the Eleventh Amendment. *See Kim v. Gant,* No. 95–2905, 1995 WL 508208 at * 2–3 (E.D.Pa. Aug.22, 1995) (state troopers sued in their official capacities were entitled to Eleventh Amendment immunity); *Fetty v. Commonwealth of Pennsylvania,* No. Civ. A. 93–6084, 1994 WL 249817 at *1–2 (E.D.Pa. June 9, 1994) (Eleventh Amendment bars suits against state officials sued in their official capacities); *Robinson v. Commonwealth of Pennsylvania,* Civ. A. No. 91–5414, 1991 WL 225079 at *1 (E.D.Pa. Oct.29, 1991) (claim against state police barred both because defendant is not a "person" subject to § 1983 liability and because the state is entitled to Eleventh Amendment immunity).

In sum, then, Plaintiff's § 1983 against Defendants Conley and Hample cannot survive the Defendants' motion to dismiss. Because we have found as a matter of law that Plaintiff's allegations fail to identify any constitutional violation on the part of the on-scene officers, it follows that Defendants Conley and Hample cannot be held liable in their supervisory capacities for the on-scene officers' conduct. Moreover, to the extent these Defendants are sued individually, Plaintiff's complaint does not allege a level of involvement on the part of Conley and Hample sufficient to hold them liable under § 1983. To the extent Conley and Hample are being sued in their official capacities, the § 1983 fails to name a proper "person" against whom liability can be established, and the claim is also barred by

the Eleventh Amendment. Count III of the Complaint will therefore be dismissed.

**B.**

 Plaintiffs' related state law claims are currently before the Court on the basis of 28 U.S.C. § 1367, which allows us to exercise supplemental jurisdiction over non-federal claims arising from the same case or controversy as the federal claims.[8] *See DeAsencio v. Tyson Foods, Inc.,* 342 F.3d 301, 308 (3d Cir.2003). Pursuant to that statute, a district court may decline to exercise supplemental jurisdiction if, *inter alia,* it has dismissed all claims over which it has original jurisdiction. *Id.* at § 1367(c)(3). In light of our dismissal of Plaintiff's § 1983 claims, we decline to exercise supplemental jurisdiction over Plaintiff's related state law claims.

## IV. CONCLUSION

Based upon the foregoing reasons, we will grant the Defendants' motion to dismiss Counts I and III of the Complaint for failure to state a claim upon which relief can be granted. The remaining counts will be dismissed pursuant to 28 U.S.C. § 1367(c)(3).

An appropriate order follows.

## *ORDER*

AND NOW, to wit, this _____ day of February, 2004, for the reasons set forth in the accompanying Memorandum Opinion,

IT IS HEREBY ORDERED that Defendants' Motion [Doc. No. 5] to Dismiss is

---

8. That statute provides, in relevant part:
 (a) Except as provided in subsections (b) and (c) or as expressly provided otherwise by Federal statute, in any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.
 28 U.S.C. § 1367(a).

GRANTED and Counts 1 and 3 of the Complaint are DISMISSED WITH PREJUDICE.

IT IS FURTHER ORDERED that this Court declines to exercise supplemental jurisdiction over Plaintiff's state law claims and, accordingly, Counts 2, 4, 5, 6 and 7 are DISMISSED WITHOUT PREJUDICE.